**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| LORI RODRIGUEZ; SECOND AMENDMENT FOUNDATION, INC.; CALGUNS FOUNDATION, INC., *Plaintiffs-Appellants*, <br><br> v. <br><br> CITY OF SAN JOSE; SAN JOSE POLICE DEPARTMENT; STEVEN VALENTINE, *Defendants-Appellees.* | No. 17-17144 <br><br> D.C. No. 5:15-cv-03698-EJD <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward J. Davila, District Judge, Presiding

Argued and Submitted January 14, 2019
San Francisco, California

Filed July 23, 2019

Before: J. Clifford Wallace, Richard R. Clifton,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Friedland

# SUMMARY[*]

### Civil Rights/Second Amendment

The panel affirmed the district court's summary judgment for defendants City of San Jose, its Police Department and a police officer in an action brought by husband and wife, Edward and Lori Rodriguez, alleging civil rights violations when police seized firearms from their residence after detaining Edward for a mental health evaluation in response to a 911 call, and then declined to return the firearms.

The City petitioned in California Superior Court to retain the firearms on the ground that the firearms would endanger Edward or another member of the public. Lori objected that the confiscation and retention of the firearms, in which she had ownership interests, violated her Second Amendment rights. The Superior Court granted the City's petition over Lori's objection and the California Court of Appeal affirmed. After Lori re-registered the firearms in her name alone and obtained gun release clearances from the California Department of Justice, the City still declined to return the guns, and Lori sued in federal court.

The panel held that Lori's Second Amendment claim was barred by issue preclusion under California law. The panel first held that although defendants failed to raise a preclusion defense in either district court or in their principal brief on appeal, it would forgive defendants' forfeiture given the significant public interests in avoiding a result

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

inconsistent with the California Court of Appeal's decision on an important constitutional question and in not wasting judicial resources on issues that had already been decided by two levels of state courts.

The panel held that the California Court of Appeal had considered and rejected a Second Amendment argument identical to the one before the panel and that the Court's decision was a final decision on the merits. The panel rejected Lori's contention that her subsequent re-registration of the guns as separate property and the Department of Justice's ownership clearance were changes that affected the state court's Second Amendment analysis. The panel noted that the state court had already assumed Lori's ownership interest under California's community property laws and must have considered Lori's exclusive ownership of her personal handgun given it was undisputed that the handgun was her separate property. The panel held that the organizational plaintiffs that had joined Lori in her federal lawsuit did not have Article III standing and therefore Lori was the sole plaintiff against whom preclusion would be applied. Finally, the panel held that redeciding the Second Amendment issue would undermine the issue preclusion doctrine's goals of comity and judicial economy.

The panel rejected Lori's contention that the warrantless confiscation of the firearms on the night of her husband's hospitalization violated her Fourth Amendment rights. The panel analyzed the seizure of the firearms under a community caretaking function framework and held that under the circumstances, the urgency of a significant public safety interest was sufficient to outweigh the significant privacy interest in personal property kept in the home. The panel emphasized that its holding that the warrantless seizure of the guns did not violate the Fourth Amendment was

limited to the particular circumstances before it: the officers had probable cause to detain involuntarily an individual experiencing an acute mental health episode and to send the individual for evaluation, they expected the individual would have access to firearms and present a serious public safety threat if he returned to the home, and they did not know how quickly the individual might return.

The panel affirmed the summary judgment on the remaining claims in a concurrently filed memorandum disposition.

---

## COUNSEL

Donald E. J. Kilmer Jr. (argued), San Jose, California, for Plaintiffs-Appellants.

Matthew W. Pritchard (argued), Deputy City Attorney; Margo Laskowska, Senior Deputy City Attorney; Nora Frimann, Assistant City Attorney; Richard Doyle, City Attorney; Office of the City Attorney, San Jose, California; for Defendants-Appellees.

Joseph G.S. Greenlee, Millenial Policy Center, Denver, Colorado, for Amicus Curiae Millennial Policy Center.

C.D. Michel, Alexander A. Frank, Sean A. Brady, and Anna M. Barvir, Michel & Associates P.C., Long Beach, California, for Amicus Curiae California Rifle & Pistol Association Inc.

Sharon Kim, Christopher Y. L. Yeung, and Philip A. Irwin, Covington & Burling LLP, New York, New York; Joshua Scharff and Jonathan E. Lowy, Brady Center to Prevent Gun

Violence, Washington, D.C., for Amicus Curiae Brady Center to Prevent Gun Violence.

T. Peter Pierce, Steven A. Nguy, and Kyle H. Brochard, Richards, Watson & Gershon, San Francisco, California, for Amici Curiae League of California Cities and International Municipal Lawyers Association.

## OPINION

FRIEDLAND, Circuit Judge:

Immediately after detaining Edward Rodriguez for a mental health evaluation in response to his wife Lori Rodriguez's 911 call, San Jose police officer Steven Valentine seized twelve firearms from the Rodriguez residence without a warrant.[1]  The City of San Jose ("the City") later petitioned in California Superior Court to retain the firearms under California Welfare & Institutions Code § 8102 on the ground that the firearms would endanger Edward or another member of the public.  Lori objected that the confiscation and retention of the firearms, in which she had ownership interests, violated her Second Amendment right.  The court granted the City's petition over Lori's objection.  Lori appealed that decision, and the California Court of Appeal affirmed.

After Lori re-registered the firearms in her name alone and obtained clearances to own the guns from the California Department of Justice ("California DOJ"), the City still declined to return the guns.  Lori sued the City, the San Jose

---

[1] Because Lori and Edward have the same last name, we refer to them by their first names.

Police Department, and Officer Valentine (collectively, "Defendants") in federal district court. She argued that the seizure and retention of the firearms violated her rights under the Second, Fourth, Fifth, and Fourteenth Amendments, and that she was also entitled to return of the firearms under California Penal Code § 33800 *et seq.* The district court rejected these arguments and accordingly granted summary judgment for Defendants. Lori appealed. We hold that Lori's Second Amendment claim is barred by issue preclusion and that her Fourth Amendment claim fails on the merits. We therefore affirm.[2]

## I.

## A.

Late one night in January 2013, Lori called 911 to ask the San Jose Police Department to conduct a welfare check on her husband, Edward. This was not the first time that Lori had made such a call—San Jose police officers had been to the Rodriguez home on prior occasions because of Edward's mental health problems. Before they arrived, Officer Valentine and the other responding officers learned that there were guns in the home.

At the Rodriguez home, Officer Valentine found Edward ranting about the CIA, the army, and people watching him. Edward also mentioned "[s]hooting up schools" and that he had a "gun safe full of guns." When asked if he wanted to hurt himself, Edward attempted to break his own thumb.

---

[2] We affirm the grant of summary judgment on Lori's Fifth Amendment, Fourteenth Amendment, and state law claims in a concurrently filed memorandum disposition.

Concluding that Edward was in the midst of an acute mental health crisis that made him a danger to himself and others, Officer Valentine and other officers on the scene decided to seize and detain him pursuant to California Welfare & Institutions Code § 5150 for a mental health evaluation. Section 5150 allows an officer, upon probable cause that an individual is a danger to himself or another because of a mental health disorder, to take the person into custody and place him in a medical facility for 72-hour treatment and evaluation. Cal. Welf. & Inst. Code § 5150 (2013); *see also* Cal. Welf. & Inst. Code § 5150(a) (2019) (same). The officers detained Edward and placed him in restraints in an ambulance to travel to a nearby hospital for a psychological evaluation.

After removing Edward from the home, the officers spoke with Lori, who confirmed that there were firearms in the home in a gun safe. Officer Valentine informed her that, pursuant to California Welfare & Institutions Code § 8102, he would have to confiscate the guns. Section 8102(a) requires law enforcement officers to confiscate any firearm or other deadly weapon that is owned, possessed, or otherwise controlled by an individual who has been detained under California Welfare & Institutions Code § 5150.

With Lori providing the keys and the combination code, the officers opened the safe and found twelve firearms, including handguns, shotguns, and semi-automatic rifles. One of the firearms was a personal handgun registered to Lori alone, which she had obtained prior to marrying Edward. The other eleven were either unregistered or registered to Edward. Lori gathered cases for the guns while the officers packed up and documented them. She specifically objected to the removal of her personal handgun,

but the officers confiscated it along with the other eleven firearms.

Meanwhile, in the ambulance, Edward repeatedly broke the restraints holding him to a gurney. Once at the hospital, Edward was evaluated and determined to be a danger to himself, so he was admitted.**[3]** He was discharged approximately one week later.

## B.

One month after the officers confiscated the firearms, the City filed a petition in California Superior Court under California Welfare & Institutions Code § 8102(c), seeking an order of forfeiture based on a determination that the guns' return would likely endanger Edward or others. Edward did not respond to the petition, but Lori intervened, asserting outright ownership of her personal handgun and community property ownership of the other firearms. Lori argued that the court had no power to interfere with her Second Amendment right to keep and bear arms because, even if Edward was prohibited from possessing and owning guns, she was not prohibited. In support, she emphasized that she had obtained a notice of eligibility to own and possess guns from the California DOJ Bureau of Firearms. Lori further represented to the court that, if returned, the guns would be secured in her gun safe and that she had changed the

---

**[3]** Under California law, once Edward was taken into custody under § 5150 and then admitted to the hospital under §§ 5151 and 5152 because he was determined to be a danger to himself, he became a "prohibited person." Cal. Welf. & Inst. Code § 8103(f)(1) (2013); *see also* Cal. Penal Code §§ 30000, 30005. As a prohibited person, he could not own, possess, control, receive, or purchase any firearm for a period of five years following his release from the hospital. Cal. Welf. & Inst. Code § 8103(f)(1) (2013).

combination code so that Edward would not have access to them. The return of the guns, she contended, therefore would not present a danger to Edward or others.

The court granted the City's petition. The court acknowledged that Lori could legally "walk . . . into any gun store and qualify to buy a handgun . . . and put [it] in that gun safe." But it held that the City was nevertheless authorized to take the "low hanging fruit" of the guns the Rodriguezes already owned, irrespective of Lori's ability to buy more, because of the danger that Edward presented. Stating that it was not "ignoring [Lori's] Constitutional Rights," the court concluded that it was not appropriate to return the firearms given the public safety concerns at stake.

Lori appealed to the California Court of Appeal, arguing that the superior court order was not supported by substantial evidence of danger and that it violated her Second Amendment right to keep and bear arms. In April 2015, the appellate court affirmed. *City of San Jose v. Rodriguez*, No. H40317, 2015 WL 1541988 (Cal. Ct. App. Apr. 2, 2015) ("*Rodriguez I*"). The court held that there was substantial evidence supporting the superior court's determination that returning the guns to the Rodriguez home would likely result in endangering Edward or others. *Id.* at *5–6, 9. On the constitutional issue, the court held that Lori had not demonstrated a viable Second Amendment claim under the United States Supreme Court's case law. *Id.* at *6–9. The court also explained that Lori had "other viable options," including selling or storing the guns outside the home, and "that the procedure provided by [California Penal Code] section 33850 et seq. for return of firearms in the possession

of law enforcement remains available to Lori."[4] *Id.* at \*7–8. Ultimately, the court concluded "that Lori ha[d] failed to show that the trial court's . . . order violate[d] the Second Amendment." *Id.* at \*9.

Lori did not seek review in the California Supreme Court or the United States Supreme Court.

Following the California Court of Appeal's decision, Lori took the necessary steps under Penal Code §§ 33850–65 to become eligible for the City to return her the firearms. She changed the registration and ownership so that all twelve guns were in her name only and obtained gun release clearances from the California DOJ. She then asked the City again to return the guns. The City denied the request one month later.

Lori subsequently sued Defendants under 42 U.S.C. § 1983 in the United States District Court for the Northern District of California. Lori was joined in the lawsuit by co-plaintiffs the Second Amendment Foundation, Inc. ("SAF") and the Calguns Foundation, Inc. ("CGF") (collectively, "Plaintiffs"). The Complaint alleged violations of Lori's Second, Fourth, Fifth, and Fourteenth Amendment rights, as well as a state law claim under California Penal Code § 33800 *et seq.* Plaintiffs sought return of the guns, damages to compensate Lori, and injunctive and declaratory relief to

---

[4] The recovery procedures in California Penal Code § 33850 *et seq.* were expressly incorporated into California Welfare & Institutions Code § 8102 while Lori's state court appeal was pending. *Rodriguez I*, 2015 WL 1541988, at \*8. The California Court of Appeal ordered supplemental briefing on the implications for Lori's claims of that statutory change and of the availability of procedures under California Penal Code § 33850 *et seq.* for the return of firearms.

prevent future violations of Lori's rights and the rights of the organizations' members.

Defendants moved for summary judgment, raising various defenses including that SAF and CGF lacked Article III standing, but not including estoppel defenses to any of Plaintiffs' federal law claims. The district court granted summary judgment to Defendants. The court rejected Defendants' argument that SAF and CGF lacked Article III standing but ruled that all of Plaintiffs' claims failed on the merits.

## II.

We review de novo a district court's summary judgment. *Longoria v. Pinal County*, 873 F.3d 699, 703–04 (9th Cir. 2017). We may affirm on any ground supported by the record, including grounds the district court did not reach. *Or. Short Line R.R. Co. v. Dep't of Revenue Or.*, 139 F.3d 1259, 1265 (9th Cir. 1998).

## A.

The California state courts addressed Lori's Second Amendment claim at both the trial and appellate stages, concluding that the seizure and retention of Lori's firearms did not violate her right to keep and bear arms. For reasons of comity, we apply issue preclusion to bar our reconsideration of her Second Amendment claim, even though Defendants did not brief that defense in the district court.[5]

---

[5] Although the *Rooker-Feldman* doctrine, which limits our authority to review the judgments of state courts, sometimes overlaps with preclusion doctrine, *see Noel v. Hall*, 341 F.3d 1148, 1160–61 (9th Cir.

The United States Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const. art. IV, § 1. As implemented under 28 U.S.C. § 1738, federal courts must "give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). This requirement has equal force in cases brought under 42 U.S.C. § 1983. *See Allen v. McCurry*, 449 U.S. 90, 97–98 (1980).

We therefore look to California law, which defines two main forms of preclusion: claim, also known as res judicata; and issue, also known as collateral estoppel. Claim preclusion "provid[es] that 'a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'"[6] *White v. City of Pasadena*, 671 F.3d 918, 926 (9th

---

2003), we have assured ourselves that *Rooker-Feldman* does not deprive us of jurisdiction here. Lori did not name the California state courts or any of its judges as defendants in her Complaint. Nor does she seek relief from the state court judgment, which *authorizes* the City to keep the guns but does not *require* the City to do so. Rather, Lori complains "of a legal injury caused by an adverse party." *Id.* at 1163. The *Rooker-Feldman* doctrine accordingly does not apply. *See id.* at 1161–64.

[6] "Claim" in this California state law context refers to a "'cause of action' [that] is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty." *Mycogen Corp. v. Monsanto Co.*, 51 P.3d 297, 306 (Cal. 2002). In this opinion, we refer to Lori's federal causes of action as "claims" without intending to suggest that her separate federal causes of action would necessarily count as separate "claims" for purposes of California state law preclusion.

Cir. 2012) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)).    "Issue preclusion, in contrast, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Id.* (quoting *Taylor*, 553 U.S. at 892).

Defendants failed to raise either form of preclusion in response to Lori's Second Amendment claim in their summary judgment briefing in the district court or in their principal brief to our court.    Only after we requested supplemental briefing on preclusion did the parties address it.  Defendants' omissions would typically effect a forfeiture. *See AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 638 (9th Cir. 2012); *Clements v. Airport Auth. of Washoe Cty.*, 69 F.3d 321, 328–30 (9th Cir. 1995).[7]

We may, however, overlook forfeiture to consider preclusion sua sponte in some circumstances.  *See Clements*, 69 F.3d at 328–31.  We determine whether to do so by balancing the public and private interests, and we are more likely to overlook forfeiture where the public interests outweigh the private.  *Id.* at 330.

This balancing in large part turns "upon the type of preclusion at stake" and generally favors forgiving forfeiture of issue preclusion more often than claim preclusion.  *Id.* Both doctrines vindicate private interests in repose and in avoiding the cost of duplicative litigation.  And both serve the public interest in conserving judicial resources by

---

[7] We recognize that *Hernandez* and *Clements* use the term "waiver," not "forfeiture."  But under our recent en banc decision in *United States v. Depue*, 912 F.3d 1227, 1232–33 (9th Cir. 2019) (en banc), we understand those cases to be describing what we now call a forfeiture.

ensuring that courts do not revisit matters that were already litigated—or should have been. But issue preclusion advances an additional public interest: "preserving the acceptability of judicial dispute resolution against the corrosive disrespect that would follow if the same matter were twice litigated to inconsistent results." *Id.* (quoting 18 Charles Allen Wright et al., Federal Practice and Procedure § 4403). Claim preclusion does not similarly prevent inconsistent results because it "bars the litigation of issues never before tried." *Id.* Given that applying issue preclusion protects more public interests, we have more reason to overlook forfeitures of that defense. *See id.*

Among Lori's federal claims, her argument that the seizure and retention of her firearms violated her Second Amendment right is the only one that she pressed before the state court. Accordingly, it is the only one to which issue preclusion could apply. Given the significant public interests in avoiding a result inconsistent with the California Court of Appeal's decision on an important constitutional question and in not wasting judicial resources on issues that have already been decided by two levels of state courts, to the extent that relitigation of Lori's Second Amendment argument would be precluded in California court, we will forgive Defendants' forfeiture and hold that "relitigation of those issues in federal court is precluded" as well. *Id.*

Under California law, issue preclusion applies when six criteria, named the "*Lucido* factors" after the California Supreme Court's seminal case on the doctrine, *Lucido v. Superior Court*, 795 P.2d 1223 (Cal. 1990), are satisfied:

> (1) "the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding"; (2) the issue to be precluded "must have been actually litigated

> in the former proceeding"; (3) the issue to be precluded "must have been necessarily decided in the former proceeding"; (4) "the decision in the former proceeding must be final and on the merits"; (5) "the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding"; and (6) application of issue preclusion must be consistent with the public policies of "preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation."

*White*, 671 F.3d at 927 (quoting *Lucido*, 795 P.2d at 1225–27). Here, the California Court of Appeal's opinion was a final decision on the merits, so the fourth factor is clearly satisfied. Whether Lori's Second Amendment argument is issue precluded in this case turns on the remaining factors.

The first three factors can be addressed together, as they all involve assessing the California Court of Appeal's Second Amendment analysis and the similarity of the argument it addressed to the argument advanced here. As she does now, Lori contended in the state court proceedings that Defendants were violating her "right to keep and bear arms" by refusing to return the firearms because of her husband's prohibited status, even though "she was not prohibited from acquiring or possessing firearms and had promised to take all steps required under California law to secure the firearms in a gun safe." *Rodriguez I*, 2015 WL 1541988, at *2, 6–7. The California Court of Appeal expressly rejected this argument and the notion that the Second Amendment required returning her the guns. Highlighting that Lori had not pointed to any authority to the

contrary, the court stated that the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), suggested that the Second Amendment did not "extend[] to keeping and bearing either any particular firearms or firearms that have been confiscated from a mentally ill person." *Rodriguez I*, 2015 WL 1541988, at *7 (emphasizing that "the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose'" (quoting *McDonald*, 561 U.S. at 786)). Ultimately, the court concluded "that Lori ha[d] failed to show that the trial court's . . . order violate[d] the Second Amendment." *Id.* at *9.

Lori seeks to escape the preclusive effect of the California Court of Appeal's Second Amendment determination by arguing that two developments since the court's decision differentiate the issue in her federal lawsuit from the issue litigated in state court: (1) Lori transmuted the eleven guns from community property to her separate personal property; and (2) Lori obtained gun clearance releases for the firearms from the California DOJ, which made her eligible for the return of the firearms under California Penal Code §§ 33850–65. But neither purported "change" affects the premises underlying the state court's Second Amendment analysis.**[8]**

---

**[8]** Lori also points to the California Legislature's passage of California Penal Code § 25135 in October 2013, at the same time that California Penal Code § 33850 *et seq.* was expressly incorporated into California Welfare & Institutions Code § 8102, as support for her contention that issue preclusion does not bar her Second Amendment claim. *See supra* n.4. According to Lori, because California Penal Code § 25135 criminalizes keeping firearms in a home with a prohibited

First, the fact that Lori obtained exclusive ownership is irrelevant for preclusion purposes because the state appellate court already assumed that Lori had an ownership interest in the guns under California's community property laws. *See Rodriguez I*, 2015 WL 1541988, at *6 (stating that the parties stipulated that Lori had standing to assert a Second Amendment right to the firearms based on her community property interest in them). Moreover, it is undisputed that at least one of the twelve guns, Lori's personal handgun, was always her separate property—accordingly, the court must have considered her exclusive ownership of that gun as part of its analysis and determined that ownership did not affect the outcome under the Second Amendment.

Second, the fact that Lori has now completed the procedural requirements of California Penal Code § 33850 *et seq.* to be eligible for the return of her firearms does not make her current situation materially different from that considered by the California Court of Appeal. The court requested and received supplemental briefing from both parties on the effect of § 33850 *et seq.* on Lori's Second Amendment right. After considering the parties' arguments, and after observing that "[a]ccording to Lori, the evidence

---

person unless they are kept in the statutorily prescribed manner, and because she would keep the firearms in a gun safe that she contends would comply with that statute, California law expressly authorizes her to possess the firearms. Lori is wrong on two levels. First, even if Lori would not be violating a criminal statute if the guns were returned to her, nothing in California Penal Code § 25135 suggests that complying with that statute vitiates a California court order forfeiting firearms under California Welfare & Institutions Code § 8102. Second, California Penal Code § 25135 had been in effect for more than a year when the California Court of Appeal published its decision, so there is nothing new about its passage that causes the issue here to be different from the issue decided by the state appellate court.

showed that she is not prohibited from owning or possessing firearms" and that "she could secure [the guns, if returned] in a gun safe to prevent Edward from having unauthorized access," *Rodriguez I*, 2015 WL 1541988, at \*5, the state appellate court held that the seizure and retention did not violate Lori's right to keep and bear arms.

Although the court noted that "the record on appeal shows that the procedure provided by section 33850 et seq. for return of firearms in the possession of law enforcement remains available to Lori," *id.* at \*8, it did not hold that completing the section's procedural requirements would alter the Second Amendment analysis. Instead, the appellate court concluded that "Lori ha[d] failed to show that the trial court's . . . order violate[d] the Second Amendment by precluding her from keeping firearms for home protection." *Id.* at \*9. In other words, as we understand the appellate court's decision, whether Lori might alternatively be able to regain the guns through a state administrative procedure was not necessary to the court's conclusion that her Second Amendment right had not been violated. *See id.* at \*8–9. We therefore conclude that the state court considered and rejected a Second Amendment argument identical to the one before us now.

We next turn to the fifth *Lucido* factor and ask whether the parties against whom preclusion is being sought are the same as, or in privity with, the parties in the former proceeding. *See Lucido,* 795 P.2d at 1225. The two organizational plaintiffs, SAF and CGF, have joined Lori in her federal suit but were not present in the state court proceedings. We hold that because the organizational plaintiffs do not have Article III standing, Lori is the sole

plaintiff against whom preclusion would be applied, so the fifth *Lucido* factor is satisfied.[9]

Plaintiffs admit that Lori is not a member of either SAF or CGF, and the organizations do not appear to assert that they have standing on behalf of any other member. They accordingly do not have standing under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977) (holding that an organization may establish standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit").

Even absent a member with standing, however, an organizational plaintiff "may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Am. Fed'n of Gov't Emps. Local 1 v. Stone*, 502 F.3d 1027, 1032 (9th Cir. 2007) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Of course, to do so, organizations must satisfy the traditional standing requirements of (1) injury in fact, (2) causation, and (3) redressability. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir.

---

[9] The fifth *Lucido* factor would also be satisfied if SAF and CGF were in privity with Lori. Because Lori is not one of their members, and because the nature of the relationship between Lori and the organizations—including whether SAF or CGF had any involvement in the state court proceedings—is unclear from the record, we have addressed this *Lucido* factor by analyzing the organizational plaintiffs' standing instead of attempting to apply the state law criteria for privity. *See Lynch v. Glass*, 119 Cal. Rptr. 139, 141–43 (Ct. App. 1975).

2010) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Our "in its own right" line of organizational standing case law stems from the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). There, a fair housing organization alleged in its complaint that it "ha[d] been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing" and that the organization had needed "to devote significant resources to identify and counteract" those practices. *Id.* at 379. The Supreme Court held that those allegations were sufficient to establish standing at the motion to dismiss stage, explaining that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitute[d] far more than simply a setback to the organization's abstract social interests." *Id.*

We have subsequently interpreted *Havens* to mean that an organization may establish "injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [injurious behavior] in question." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (citation omitted). The organization cannot, however, "manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores*, 624 F.3d at 1088. In other words, an organizational plaintiff must show that the defendant's actions run counter to the organization's purpose, that the organization seeks broad relief against the defendant's actions, and that granting relief would allow the organization to redirect resources currently spent combating the specific

challenged conduct to other activities that would advance its mission.

For example, in *El Rescate Legal Services, Inc. v. Executive Office of Immigration Review*, 959 F.2d 742 (9th Cir. 1991), organizations assisting Central American refugee clients in their efforts to obtain immigration relief brought suit challenging the government's policy and practice of using incompetent translators and of not interpreting portions of immigration court hearings. *Id.* at 745, 748. We held that the organizations had standing because the policy "frustrate[d] [the organizations'] goals and require[d] the organizations to expend resources in representing clients they otherwise would spend in other ways." *Id.* at 748 (citing *Havens*, 455 U.S. at 379).

Similarly, in *People for the Ethical Treatment of Animals v. United States Department of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015), the plaintiff organization alleged that it had needed to expend additional resources to ensure the humane treatment of birds because the USDA had failed to apply the protections of the Animal Welfare Act to birds even after promising for ten years to do so. *Id.* at 1089, 1094–95. The D.C. Circuit held that because the plaintiff had specifically alleged how it diverted resources to address the USDA's failure to apply the Act to birds, there was enough evidence of injury to satisfy Article III's standing requirements. *Id.* at 1096–97.[10]

---

[10] Writing separately in *People for the Ethical Treatment of Animals*, Judge Millett contended that there is "grave tension" between the expansion of *Havens*-based organizational standing and broader Article III standing principles. *Id.* at 1099–1106 (Millett, J., dubitante). Although Judge Millett recognized that, under current precedent, an organizational plaintiff's expenditure of resources can be sufficient to

By contrast to the organizational plaintiffs in *El Rescate* and *People for the Ethical Treatment of Animals*, Plaintiffs here challenge only the City's seizure of one person's, Lori's, guns and the refusal to give them back. Although the organizational plaintiffs state in the Complaint that they are seeking prospective injunctive relief "to prevent future violations of their members' constitutional right[s]," the *Havens* theory of standing they relied on exclusively at summary judgment is not based on injury to their members. And the only specific remedy ever requested was return of the guns to Lori (who, again, is not a member of either SAF or CGF). The organizational plaintiffs have not explained how the City's retention of Lori's guns either impedes their

establish standing, she expressed concern that the doctrine allows an organization to bring suit "every time [it] believes that the government is not enforcing the law as much, as often, or as vigorously as it would like." *Id.* at 1103. She found this "hard to reconcile with the general rule that a plaintiff's voluntary expenditure of resources to counteract governmental action that only indirectly affects the plaintiff does not support standing." *Id.* at 1099 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–16 (2013)); *see also Fair Hous. Council v. Roommate.com, LLC*, 666 F.3d 1216, 1224–27 (9th Cir. 2012) (Ikuta, J., concurring and dissenting) (criticizing our case law holding "that an organization with a social interest in advancing enforcement of a law was injured when the organization spent money enforcing that law," because "[t]his looks suspiciously like a harm that is simply 'a setback to the organization's abstract social interests,' [which] *Havens* indicated was not a 'concrete and demonstrable injury,'" and urging en banc reconsideration of our organizational standing doctrine). We share many of these concerns but are bound to apply current precedent regardless. *See E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1242–43 (9th Cir. 2018) (recognizing these criticisms of *Havens*-based organizational standing but also recognizing that three-judge panels of our court may not depart from prior precedent). In any event, these concerns are not directly implicated here because, as we explain below, SAF and CGF lack standing even under the line of standing case law that Judge Millett and Judge Ikuta believe has gone astray.

ability to carry out their mission or requires them to divert substantial resources away from the organizations' preferred uses—let alone both. Relatedly, the organizations have not shown how the requested relief would redress any broader harm that the organizations work to combat.

Each organization has produced a single affidavit from a high-ranking official to attempt to establish Article III standing. In his affidavit, SAF's executive vice president asserted only that the organization's purpose "include[s] education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms [as well as] the consequences of gun control and legislation that impacts the 'right to keep and bear arms.'" CGF's executive director similarly framed CGF's mission as "promoting education for all stakeholders about California and federal firearms laws . . . and defending and protecting the civil rights of California gun owners." Both organizations also allege that they expend resources advising and assisting members and non-members in navigating California's gun laws and attempting to recover confiscated firearms. But neither organization presents any evidence of expending resources to assist Lori apart from incurring litigation costs as co-plaintiffs in her federal litigation.

The mere fact that these organizations represent California gun owners and provide legal advice in navigating California's gun laws does not automatically lead to the conclusion that the confiscation and retention of Lori's guns frustrates their missions or requires them to divert resources. Because SAF and CGF have offered no theory explaining their organizational harm—let alone evidence supporting such a theory, as is required at the summary judgment

stage—they have not demonstrated Article III standing.[11] And without the presence of the organizational plaintiffs, we are left considering issue preclusion against only Lori, the same party who litigated the state court proceedings. The fifth *Lucido* factor is thus satisfied.

Finally, under the sixth *Lucido* factor, we ask whether applying issue preclusion here would promote the public policies of "preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation." *Lucido*, 795 P.2d at 1227. Throughout the state court proceedings, the question whether the seizure and retention of the firearms violated Lori's Second Amendment right was at center stage. The California Superior Court and the California Court of Appeal both expressly considered and ruled on that issue. Redeciding it now, when the facts and Lori's arguments have not materially changed from what was presented in the state proceedings, would undermine the issue preclusion doctrine's goals of comity and judicial economy, so the requirements of the sixth *Lucido* factor are also met.

For these reasons, we hold that Lori's Second Amendment challenge is precluded under California law.

---

[11] Unlike in *Havens*, which the Supreme Court considered at the motion to dismiss stage, we are reviewing the organizations' Article III standing here on appeal from summary judgment. Accordingly, SAF and CGF were required to support their standing claims with "specific facts" showing the frustration of their purpose and diversion of their resources through affidavits or other evidence. *See Lujan*, 504 U.S. at 561 ("[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," but at the summary judgment stage "the plaintiff can no longer rest on such mere allegations and instead must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true" (citations and quotation marks omitted)).

We therefore affirm judgment for Defendants on Lori's Second Amendment claim without further analysis.

## B.

Lori also argues that the officers' warrantless confiscation of her firearms on the night of her husband's hospitalization violated her Fourth Amendment rights. "A seizure conducted without a warrant is '*per se* unreasonable under the Fourth Amendment,'" with some limited exceptions. *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993)).[12] We hold that an exception to the warrant requirement applies here, so we reject Lori's Fourth Amendment claim.[13]

The Supreme Court has recognized a category of police activity relating to the protection of public health and safety—a category commonly referred to as the "community caretaking function"—that is "totally divorced from the detection, investigation, or acquisition of evidence relating

---

[12] The Fourth Amendment also protects against warrantless searches, absent an exception. *United States v. Martinez*, 406 F.3d 1160, 1163 (9th Cir. 2005) (explaining that searches, as well as seizures, inside a home are presumptively unreasonable). Lori has not challenged any search. Indeed, in her opening brief to our court, she emphasized that "there was no search." We therefore limit our Fourth Amendment inquiry to the reasonableness of the seizure.

[13] Unlike the Second Amendment challenge, Lori's Fourth Amendment arguments were neither raised nor decided in state court, so issue preclusion could not apply. And, as explained above, there is less reason to forgive waiver of claim preclusion than there is to forgive waiver of issue preclusion, so even if the Fourth Amendment argument could be viewed as part of the same claim that Lori pursued in state court, we would decline to consider claim preclusion sua sponte.

to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). Searches and seizures performed under the community caretaking function, like those performed pursuant to the criminal investigatory function, are subject to the Fourth Amendment's warrant requirement. *See United States v. Erickson*, 991 F.2d 529, 531–32 (9th Cir. 1993) (holding that the "community caretaking function . . . cannot itself justify a warrantless search"). Thus, the government must demonstrate that a search or seizure conducted to protect public health or safety but without a warrant falls within an exception to the warrant requirement.

We have previously recognized two types of police action in which an officer may conduct a warrantless search or seizure when acting within the community caretaking function: (1) home entries to investigate safety or medical emergencies, and (2) impoundments of hazardous vehicles.

The first category, termed the "emergency exception," authorizes a warrantless home entry where officers "ha[ve] an objectively reasonable basis for concluding that there [i]s an immediate need to protect others or themselves from serious harm; and [that] the search's scope and manner [a]re reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). As with many exceptions to the warrant requirement, we "judge whether or not the emergency exception applies in any given situation based on the totality of the circumstances," with the government bearing the burden of showing "that the search at issue meets these parameters." *Hopkins v. Bonvicino*, 573 F.3d 752, 764 (9th Cir. 2009) (quoting *United States v. Stafford*, 416 F.3d 1068, 1074 (9th Cir. 2005)). That burden includes "show[ing] that a warrant could not have been obtained in time." *United States v. Struckman*, 603 F.3d 731, 738 (9th

Cir. 2010) (quoting *United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986)).**[14]**

Until now, our case law on seizures under the community caretaking function has related solely to the second category: impounding vehicles that "jeopardize public safety and the efficient movement of vehicular traffic," oftentimes after the driver has been detained or has otherwise become incapacitated. *Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 368–69 (1976)); *see also United States v. Jensen*, 425 F.3d 698, 706 (9th Cir. 2005) ("Once the arrest [of the driver] was made, the doctrine allowed law enforcement officers to seize and remove any vehicle which may impede traffic, threaten public safety, or be subject to vandalism."). In those cases, to determine whether the seizure was reasonable, we balanced the urgency of the public interest in safe, clear roads against the private interest in preventing the police from interfering with a person's property. *Compare United States v. Torres*, 828 F.3d 1113, 1120 (9th Cir. 2016) (holding that it did not violate the Fourth Amendment to impound a vehicle that, among other concerns, was "positioned in a manner that could impede

---

**[14]** By contrast, the exigent circumstances exception arises within the police's investigative function. *Hopkins*, 573 F.3d at 763. Under that exception to the warrant requirement, police may "enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is 'necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'" *Id.* (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc)). Defendants do not attempt to rely on the exigent circumstances exception here, so we need not decide whether it could have applied.

emergency services") *with United States v. Caseres*, 533 F.3d 1064, 1075 (9th Cir. 2008) (concluding that it was constitutionally unreasonable for police to impound a car when the car was lawfully parked near the arrested driver's residence and when there was no showing that the car was likely to be stolen or vandalized, or to impede traffic).[15] These vehicle seizure cases are similar to the emergency exception home entry cases because they allow the police to respond to an immediate threat to community safety.

A seizure of a firearm in the possession or control of a person who has been detained because of an acute mental health episode likewise responds to an immediate threat to community safety. We believe the same factors at issue in the context of emergency exception home entries and vehicle impoundments—(1) the public safety interest; (2) the urgency of that public interest; and (3) the individual property, liberty, and privacy interests—must be balanced, based on all of the facts available to an objectively reasonable officer, when asking whether such a seizure of a firearm falls within an exception to the warrant requirement.

Other circuits have looked at precisely such factors in analyzing whether guns could be seized without a warrant to protect the gun owner or those nearby. For example, in *Mora v. City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008), a firefighter (Mora) called 911 and told the operator that "he was suicidal, had weapons in his apartment, could understand shooting people at work, and said, 'I might as well die at work.'" *Id.* at 220. After confirming with one of Mora's coworkers that his threats should be taken seriously,

---

[15] To properly impound a motor vehicle without a warrant, law enforcement must also act "in conformance with the standardized procedures of the local police department." *Torres*, 828 F.3d at 1118.

but without first obtaining a warrant, police drove to Mora's apartment and found him loading his vehicle with suitcases and gym bags. *Id.* The police confiscated the bags and found a gun inside. *Id.* Police then took Mora's keys, entered his apartment, and discovered a large gun safe containing twenty-one guns and keys to a second safe. *Id.* They ultimately located forty-one firearms, ammunition, and survivalist literature throughout the apartment. *Id.* The police detained Mora for a mental health evaluation and then seized the firearms without a warrant. *Id.*

The Fourth Circuit held that the officers had not violated Mora's Fourth Amendment rights. The Fourth Circuit "identif[ied] the individual and governmental interests at stake and balanc[ed] them for reasonableness in light of the circumstances." *Id.* at 223. Weighing the government's interest in "[p]rotecting the physical security of its people" from "an individual who intends slaughter" against the private interests in liberty, privacy, and property, the court observed that "[r]especting the rights of individuals has never required running a risk of mass death." *Id.* at 223–24. Rather, the court explained that "[a]s the likelihood, urgency, and magnitude of a threat increase, so does the justification for and scope of police preventive action." *Id.* at 224. Applying these principles, the Fourth Circuit held that the officers had "a sound basis for seizing Mora's weapons, whether or not they were contraband or evidence." *Id.* at 227. The court also rejected the argument that Mora's previous removal from the scene diminished the public safety justification for seizing the guns because the officers had no idea whether Mora's "confederates might possess access to Mora's considerable store of firearms, or whether Mora himself might return to the apartment more quickly than expected." *Id.* at 228.

The D.C. Circuit considered similar factors in *Corrigan v. District of Columbia*, 841 F.3d 1022 (D.C. Cir. 2016), and ultimately held that there was not a sufficiently imminent threat to justify the warrantless search of a home and seizure of guns found inside. *Id.* at 1035. In that case, the police were dispatched in the middle of the night to a military veteran's (Corrigan's) home for what they believed to be an "attempted suicide." *Id.* at 1026. They learned from his ex-girlfriend and landlord that Corrigan had weapons, had recently ended a romantic relationship, and was under psychiatric care for PTSD and depression. *Id.* at 1026. After the police attempted to contact him numerous times over the course of several hours, Corrigan woke up and voluntarily came outside. *Id.* at 1026–27. He surrendered himself into the officers' custody, though he refused to consent to a search of his home. *Id.* at 1027.

Despite having Corrigan in custody, the police broke into his home, first conducting a "sweep" for injured persons or threats and then performing a "top-to-bottom warrantless search" to look for "any hazardous materials that could remain on the scene and be dangerous to the public." *Id.* During the search, the officers broke into several locked boxes and discovered multiple firearms, a military smoke grenade, fireworks, and ammunition. *Id.* at 1028.

The D.C. Circuit held that the search was unreasonable under the Fourth Amendment. *Id.* at 1035. Emphasizing that the police "had been on the scene for five hours and fully secured the area prior to the [] entry and search," as well as the fact that Corrigan had surrendered peacefully, *id.* at 1034, the court concluded that "there was no objectively reasonable factual basis for the [police] to believe an *imminently dangerous hazard* could be present in Corrigan's

home, particularly after completing the 'sweep,'" *id.* at 1031 (emphasis added).

Applying the same analytical framework, we hold that the warrantless seizure of the Rodriguezes' guns was appropriate. The seizure of the firearms did affect a serious private interest in personal property kept in the home. On the other hand, the public interest at stake here was also very significant. San Jose police officers had previously been to the home on prior occasions because Edward was acting erratically, and on the day in question, Edward was ranting about the CIA, the army, and other people watching him. He also mentioned "[s]hooting up schools," specifically referencing the guns in the safe. Edward's threats may not have been as explicit as the threats made in *Mora*, but a reasonable officer would have been deeply concerned by the prospect that Edward might have had access to a firearm in the near future. Consequently, there was a substantial public safety interest in ensuring that the guns would not be available to Edward should he return from the hospital.

With significant private and public interests present on both sides, the urgency of the public safety interest is the key consideration in deciding whether the seizure here was reasonable. We believe that, on this record, the urgency of the situation justified the seizure of the firearms.

Importantly, the officers had no idea when Edward might return from the hospital. Even though California Welfare & Institutions Code § 5150 authorized the detention of Edward for a period of up to 72 hours for treatment and evaluation, he could only be held for that period if the hospital staff actually admitted him. *See id.* §§ 5150 (2013), 5151 (2013). As Lori conceded at oral argument, as far as the officers knew, Edward could have returned to the home at any time—making it uncertain that a warrant could have been

obtained quickly enough to prevent the firearms from presenting a serious threat to public safety.

Lori asserts two primary counterarguments to the conclusion that there was sufficient urgency to justify the warrantless seizure of the firearms. First, she argues that any urgency was diminished because she could change the combination to the gun safe, preventing Edward from accessing the guns. But even assuming Lori could have changed the combination before Edward could have returned, it was reasonable to believe that Edward, who weighed 400 pounds, could have overpowered her to gain access to the guns. Second, Lori contended at oral argument that telephonic warrants are available in San Jose and that the officers could have obtained such a warrant more quickly than Edward could have returned if the hospital had not admitted him. But she has offered no support for either assertion. And without evidence or other support for her conclusory statements, Lori has not carried her burden in opposing summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).[16]

Our holding that the warrantless seizure of the guns did not violate the Fourth Amendment is limited to the particular circumstances here: the officers had probable cause to detain involuntarily an individual experiencing an acute mental health episode and to send the individual for evaluation, they expected the individual would have access to firearms and present a serious public safety threat if he returned to the

---

[16] As noted above, *see supra* n.15, police must act "in conformance" with department procedures when impounding a vehicle without a warrant. *See Torres*, 828 F.3d at 1118. We need not decide whether there is an equivalent requirement for the seizure of firearms because Lori has not disputed the officers' compliance with San Jose Police Department procedures here.

home, and they did not know how quickly the individual might return.  Under these circumstances, the urgency of a significant public safety interest was sufficient to outweigh the significant privacy interest in personal property kept in the home, and a warrant was not required.

### III.

For the foregoing reasons, we **AFFIRM**.