# United States Court of Appeals
## For the First Circuit

No. 19-1764

EDWARD A. CANIGLIA,

Plaintiff, Appellant,

v.

ROBERT F. STROM, as the Finance Director of the City of
Cranston, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Barron, Circuit Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

Thomas W. Lyons, with whom Rhiannon S. Huffman and Strauss,
Factor, Laing & Lyons were on brief, for appellant.
Marc DeSisto, with whom Patrick K. Cunningham, Caroline V.
Murphy, and DeSisto Law LLC were on brief, for appellees.

March 13, 2020

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SELYA**, **Circuit Judge**.  There are widely varied circumstances, ranging from helping little children to cross busy streets to navigating the sometimes stormy seas of neighborhood disturbances, in which police officers demonstrate, over and over again, the importance of the roles that they play in preserving and protecting communities.  Given this reality, it is unsurprising that in Cady v. Dombrowski, 413 U.S. 433 (1973), the Supreme Court determined, in the motor vehicle context, that police officers performing community caretaking functions are entitled to a special measure of constitutional protection.  See id. at 446-48 (holding that warrantless search of disabled vehicle's trunk to preserve public safety did not violate Fourth Amendment).  We hold today — as a matter of first impression in this circuit — that this measure of protection extends to police officers performing community caretaking functions on private premises (including homes).  Based on this holding and on our other conclusions, we affirm the district court's entry of summary judgment for the defendants in this highly charged case.

## I. BACKGROUND

We start with the cast of characters.  At the times material hereto, plaintiff-appellant Edward A. Caniglia resided with his wife, Kim Caniglia, in Cranston, Rhode Island.  The defendants include the City of Cranston (the City), Colonel Michael

J. Winquist (Cranston's police chief), and five Cranston police officers.[1]

Having identified the central players, we rehearse the relevant facts in the light most congenial to the summary judgment loser (here, the plaintiff). See Avery v. Hughes, 661 F.3d 690, 691 (1st Cir. 2011). On August 20, 2015, marital discord erupted at the Caniglia residence. During the disagreement, the plaintiff retrieved a handgun from the bedroom — a handgun that (unbeknownst to Kim in that moment) was unloaded. Kim initially maintained that the plaintiff also brought out a magazine for the gun, but she subsequently stated in a deposition that she only remembered his retrieval of the handgun. Throwing the gun onto the dining room table, the plaintiff said something like "shoot me now and get it over with." Although the plaintiff suggests that this outburst was merely a "dramatic gesture," Kim took it seriously: worried about her husband's state of mind even after he had left to "go for a ride," she returned the gun to its customary place and hid the magazine. Kim also decided that she would stay at a

---

[1] The plaintiff sued Colonel Winquist and the five officers — Brandon Barth, Russell C. Henry, Jr., John Mastrati, Wayne Russell, and Austin Smith — in both their individual and official capacities. He also sued a sixth officer, Robert Quirk, but the entry of judgment in Quirk's favor has not been appealed. Additionally, the plaintiff sued the City by and through its Finance Director, Robert F. Strom. See R.I. Gen. Laws § 45-15-5.

hotel for the night if the plaintiff had not calmed down when he returned. She began to pack a bag.

The plaintiff's return sparked a second spat. This time, Kim departed to spend the night at a nearby hotel. When Kim spoke to the plaintiff by telephone that evening, he sounded upset and "[a] little" angry.

The next morning, Kim was unable to reach her husband by telephone. Concerned that he might have committed suicide or otherwise harmed himself, she called the Cranston Police Department (CPD) on a non-emergency line and asked that an officer accompany her to the residence. She said that her husband was depressed and that she was "worried for him." She also said that she was concerned "about what [she] would find" when she returned home.

Soon thereafter, Officer Mastrati rendezvoused with Kim. She recounted her arguments with the plaintiff the previous day, his disturbing behavior and statements, and her subsequent concealment of the magazine. At some point during this discussion, Kim mentioned that the handgun her husband produced the previous day had not been loaded. The record contains conflicting evidence about whether Kim told the officers that the plaintiff brought out the magazine in addition to the unloaded handgun. Although Kim made clear that she was not concerned for her own safety, she stressed that, based on her fear that her husband might have

- 4 -

committed suicide, she was "afraid of what [she] would find when [she] got home."

Officer Mastrati then called the plaintiff, who said that he was willing to speak with the police in person. By this time, Sergeant Barth and Officers Russell and Smith had arrived on the scene. The four officers went to the residence and spoke with the plaintiff on the back porch while Kim waited in her car. The plaintiff corroborated Kim's account, stating that he brought out the firearm and asked his wife to shoot him because he was "sick of the arguments" and "couldn't take it anymore." When the officers asked him about his mental health, he told them "that was none of their business" but denied that he was suicidal. Officer Mastrati subsequently reported that the plaintiff "appeared normal" during this encounter, and Officer Russell described the plaintiff's demeanor as calm and cooperative. This appraisal, though, was not unanimous: Sergeant Barth thought the plaintiff seemed somewhat "[a]gitated" and "angry," and Kim noted that he became "very upset" with her for involving the police.

The ranking officer at the scene (Sergeant Barth) determined, based on the totality of the circumstances, that the plaintiff was imminently dangerous to himself and others. After expressing some uncertainty, the plaintiff agreed to be transported by ambulance to a nearby hospital for a psychiatric evaluation. The plaintiff claims that he only agreed to be

transported because the officers told him that his firearms would not be confiscated if he assented to go to the hospital for an evaluation. But the record contains no evidence from any of the four officers who were present at the residence suggesting that such a promise was made.

At some point that morning, someone (the record is unclear as to whether the "someone" was Kim or the plaintiff) informed the officers that there was a second handgun on the premises. After the plaintiff departed by ambulance for the hospital, unaccompanied by any police officer, Sergeant Barth decided to seize these two firearms. A superior officer (Captain Henry) approved that decision by telephone. Accompanied by Kim, one or more of the officers entered the house and garage, seizing the two firearms, magazines for both guns, and ammunition. Kim directed the officers to each of the items seized. The parties dispute both whether Kim indicated that she wanted the guns removed and whether the officers secured her cooperation by telling her that her husband had consented to confiscation of the firearms. There is no dispute, though, that the officers understood that the firearms belonged to the plaintiff and that he objected to their seizure.

The plaintiff was evaluated at Kent Hospital but not admitted as an inpatient. In October of 2015 — after several unsuccessful attempts to retrieve the plaintiff's firearms from

- 6 -

the CPD — the plaintiff's attorney formally requested their return. The firearms were returned in December. The CPD never prevented the plaintiff from obtaining other firearms at any time. Nor did the events at issue involve any criminal offense or investigation.

Shortly before his firearms were returned, the plaintiff repaired to the federal district court, pressing a salmagundi of claims stemming from the defendants' alleged seizures of his person and his firearms. These claims included, as relevant here, claims brought pursuant to 42 U.S.C. § 1983 alleging violations of the Second and Fourth Amendments, as well as state-law claims alleging violations of the Rhode Island Constitution; the Rhode Island Mental Health Law (RIMHL), R.I. Gen. Laws §§ 40.1-5-1 to -43; and the Rhode Island Firearms Act (RIFA), R.I. Gen. Laws §§ 11-47-1 to -63.

Once discovery was completed, the parties cross-moved for summary judgment. With one exception, the district court granted summary judgment in the defendants' favor on the plaintiff's federal and state-law claims. See Caniglia v. Strom, 396 F. Supp. 3d 227, 242 (D.R.I. 2019).[2] This timely appeal followed.

---

[2] The district court granted summary judgment in the plaintiff's favor on one claim. See Caniglia, 396 F. Supp. 3d at 237-38. Specifically, the court ruled that the City violated the plaintiff's due process rights in two ways: by seizing his firearms without providing notice of any mechanism to secure their return and by arbitrarily denying his initial requests for their

**II. ANALYSIS**

Orders granting summary judgment engender de novo review. See Avery, 661 F.3d at 693. In conducting this tamisage, we scrutinize the record in the light most hospitable to the nonmovant (here, the plaintiff) and affirm "only if the record reveals 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)). We are not wedded to the district court's reasoning but, rather, may affirm "on any ground made manifest by the record." Mason v. Telefunken Semiconductors Am., LLC, 797 F.3d 33, 38 (1st Cir. 2015). Against this backdrop, we examine the plaintiff's claims one by one.

## A. The Fourth Amendment Claims.

The centerpiece of the plaintiff's asseverational array is his contention that the defendant officers offended the Fourth Amendment both by transporting him involuntarily to the hospital for a psychiatric evaluation and by seizing two firearms after a warrantless entry into his home. We begin with constitutional bedrock: the Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend.

---

return. See id. at 238. Pursuant to a stipulation, the court later awarded the plaintiff nominal damages. No appeal has been taken from these rulings.

IV. The officers assert that their conduct at the plaintiff's residence constituted a reasonable exercise of their community caretaking responsibilities and thus did not transgress the Fourth Amendment. The district court agreed.[3] See Caniglia, 396 F. Supp. 3d at 234-35. Before plunging into these turbulent waters, we pause to frame the issues and to clarify certain threshold matters.

1. **Framing the Issues.** The plaintiff's Fourth Amendment claims focus on two alleged seizures, one of his person and the other of his firearms. The seizure of a person occurs when an objectively reasonable individual, standing in that person's shoes, would not have "felt free to cease interaction with the officer[s] and depart." United States v. Espinoza, 490 F.3d 41, 48-49 (1st Cir. 2007); see United States v. Drayton, 536 U.S. 194, 200-01 (2002). In contrast, a seizure of personal property occurs when there has been "some meaningful interference with an

_____

[3] The district court ruled in the alternative that qualified immunity provided a shield against Fourth Amendment liability. See Caniglia, 396 F. Supp. 3d at 235-36; see also McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017) ("Qualified immunity is a doctrine that shelters government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982))). Qualified immunity, though, offers no refuge either to the City or to the officers in their official capacities. See Haley v. City of Boston, 657 F.3d 39, 51 (1st Cir. 2011); Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir. 1993). Because we are able to resolve the plaintiff's Fourth Amendment claims on the merits, we do not address the district court's alternative ruling.

individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984).

Although the plaintiff concedes that he ultimately agreed to be transported to the hospital for a psychiatric evaluation, he nonetheless complains that he was subjected to an involuntary seizure. In support, he avers that the defendant officers extracted his consent through impermissible chicanery, falsely promising that they would not confiscate his firearms if he agreed to go to the hospital for a psychiatric evaluation. The defendants do not challenge this averment head-on but, rather, assume for purposes of this appeal that a seizure of the plaintiff's person occurred. Even though there is no evidence that any police officers, emergency services personnel, or hospital staff physically compelled the plaintiff to submit to a psychiatric evaluation once he reached the hospital, we assume — favorably to the plaintiff — that the involuntary seizure of his person lasted through his eventual psychiatric evaluation.[4]

---

[4] In indulging this assumption, we do not abandon the longstanding principle that "deception is a well-established and acceptable tool of law enforcement." Pagán-González v. Moreno, 919 F.3d 582, 591 (1st Cir. 2019). Although some species of deception (such as false claims of a warrant or fabricated exigencies) may vitiate consent, see id. at 594-95, we are aware of no persuasive precedent establishing that an officer's strategic deployment of an empty promise, standing alone, constitutes coercion sufficient to vitiate consent in this context.

Two other threshold matters demand our attention. The first requires some stage-setting. The record makes pellucid that the officers' initial presence on the plaintiff's back porch was lawful: the plaintiff's wife had summoned them to the premises and the plaintiff himself had agreed to speak with the officers outside the residence. See Florida v. Jardines, 569 U.S. 1, 7-8 (2013) (observing that police do not violate Fourth Amendment by occupying curtilage when homeowner has "given his leave (even implicitly) for them to do so"). But whether the officers' entry into the home after the plaintiff's departure was consensual is a more nuanced matter.

Although the parties agree that the plaintiff's wife led the officers to both of the firearms, the plaintiff asserts that the officers secured his wife's permission to enter the home and seize the firearms by falsely representing that the plaintiff had consented to their confiscation. Even though deception is not categorically foreclosed as a tool of police work, see supra note 4, consent may sometimes be deemed involuntary if gained through a police officer's apocryphal claim of authority, see Pagán-González v. Moreno, 919 F.3d 582, 593, 596 (1st Cir. 2019); United States v. Vázquez, 724 F.3d 15, 22 (1st Cir. 2013); United States v. Miller, 589 F.2d 1117, 1132 (1st Cir. 1978). Given the factual disputes surrounding the representations made to the plaintiff's

- 11 -

wife, we think it prudent to assume that the officers' entry into the home was not only warrantless but also nonconsensual.

The remaining threshold matter requires no assumption on our part.  The undisputed facts establish that a seizure of the plaintiff's firearms occurred.  It is uncontroverted that the defendant officers understood that the two handguns belonged to the plaintiff and that he objected to any confiscation of them. And in this venue, the defendants press no argument that they secured valid consent from the plaintiff's wife to seize the firearms.

**2. The Scope of the Community Caretaking Doctrine.**  The defendants seek to wrap both of the contested seizures in the community caretaking exception to the warrant requirement. Notably, they do not invoke either the exigent circumstances or emergency aid exceptions to the warrant requirement.[5]  Nor do the

---

[5] As we have previously noted, there is substantial overlap between the community caretaking, exigent circumstances, and emergency aid exceptions.  See MacDonald v. Town of Eastham, 745 F.3d 8, 13-14, 13 nn.2-3 (1st Cir. 2014).  "[C]ourts do not always draw fine lines" between these exceptions.  Id. at 13; see Sutterfield v. City of Milwaukee, 751 F.3d 542, 553, 561 (7th Cir. 2014) (resolving analogous case under emergency aid exception but acknowledging that community caretaking doctrine "would potentially be the best fit").  Because the defendants seek shelter only behind the community caretaking exception, we have no occasion to craft crisp distinctions between those three exceptions.  We doubt, however, that either the exigent circumstances exception or the emergency aid exception would be a perfect fit for the full tableau of this case.  On the one hand, exigency "is defined by a time-urgent need to act that makes resort to the warrant process impractical" — an inquiry that is of limited utility outside the

- 12 -

defendants contend that their seizures of the plaintiff and his firearms were carried out pursuant to a state civil protection statute. See, e.g., Alfano v. Lynch, 847 F.3d 71, 77 (1st Cir. 2017).

The community caretaking exception derives from Cady, a case in which the Supreme Court upheld the warrantless search of a disabled vehicle when the police reasonably believed that the vehicle's trunk contained a gun and the vehicle was vulnerable to vandals. See 413 U.S. at 446-48. The Cady Court explained that police officers frequently engage in such "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441. Police activity in furtherance of such functions (at least in the motor vehicle context) does not, the Court held, offend the Fourth Amendment so long as it is executed in a reasonable manner pursuant to either "state law or sound police procedure." Id. at 446-48; see South Dakota v. Opperman, 428 U.S. 364, 374-75 (1976). In reaching this conclusion, the Cady Court noted the "constitutional difference between searches

criminal investigatory process. Sutterfield, 751 F.3d at 559-60. On the other hand, the emergency aid exception is typically employed in scenarios in which an individual within a dwelling has already been seriously injured or may be about to sustain such injuries in a matter of moments. See, e.g., Michigan v. Fisher, 558 U.S. 45, 45-46, 48 (2009) (per curiam); Brigham City v. Stuart, 547 U.S. 398, 406 (2006); Hill v. Walsh, 884 F.3d 16, 23 (1st Cir. 2018).

of and seizures from houses and similar structures and from vehicles," a distinction stemming from the "ambulatory character" of vehicles and police officers' "extensive, and often noncriminal contact with automobiles." 413 U.S. at 442; see Opperman, 428 U.S. at 367-68.

Since Cady, the community caretaking doctrine has become "a catchall for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities." United States v. Rodriguez-Morales, 929 F.2d 780, 785 (1st Cir. 1991); see MacDonald v. Town of Eastham, 745 F.3d 8, 12 (1st Cir. 2014). In accordance with "this evolving principle, we have recognized (in the motor vehicle context) a community caretaking exception to the warrant requirement." MacDonald, 745 F.3d at 12. Elucidating this exception, we have held that the Fourth Amendment's imperatives are satisfied when the police perform "noninvestigatory duties, including community caretaker tasks, so long as the procedure employed (and its implementation) is reasonable." Rodriguez-Morales, 929 F.2d at 785. Police officers enjoy wide latitude in deciding how best to execute their community caretaking responsibilities and, in the typical case, need only act "within the realm of reason" under the particular circumstances. Id. at 786; see Lockhart-Bembery v. Sauro, 498 F.3d 69, 75 (1st Cir. 2007).

Until now, we have applied the community caretaking exception only in the motor vehicle context. See United States v. Davis, 909 F.3d 9, 16-17 (1st Cir. 2018), cert. denied, 139 S. Ct. 1352 (2019); Boudreau v. Lussier, 901 F.3d 65, 72-73 (1st Cir. 2018); Jaynes v. Mitchell, 824 F.3d 187, 197 (1st Cir. 2016); United States v. Gemma, 818 F.3d 23, 32 (1st Cir. 2016); Lockhart-Bembery, 498 F.3d at 75-76; United States v. Coccia, 446 F.3d 233, 238-40 (1st Cir. 2006); Rodriguez-Morales, 929 F.2d at 784-87; cf. Miller, 589 F.2d at 1125 (upholding boarding of abandoned boat under combination of community caretaking and exigent circumstances exceptions). But on one notable occasion, we have recognized a community caretaking function extending beyond vehicle searches and impoundment, holding that the temporary seizure of a motorist for the purpose of alleviating dangerous roadside conditions could be a reasonable exercise of the community caretaking function. See Lockhart-Bembery, 498 F.3d at 71-72, 75-76.

To be sure, the doctrine's reach outside the motor vehicle context is ill-defined and admits of some differences among the federal courts of appeals. See Matalon v. Hynnes, 806 F.3d 627, 634 (1st Cir. 2015); MacDonald, 745 F.3d at 13. A few circuits have indicated that the community caretaking exception cannot justify a warrantless entry into a home. See Sutterfield v. City of Milwaukee, 751 F.3d 542, 554 (7th Cir. 2014); Ray v. Township

- 15 -

of Warren, 626 F.3d 170, 177 (3d Cir. 2010); cf. United States v. Pichany, 687 F.2d 204, 208-09 (7th Cir. 1982) (per curiam) (holding community caretaking exception not applicable to warrantless entry into business warehouse). Several other circuits, though, have recognized that the doctrine allows warrantless entries onto private premises (including homes) in particular circumstances. See, e.g., Rodriguez v. City of San Jose, 930 F.3d 1123, 1137-41 (9th Cir. 2019), petition for cert. filed, No. 19-1057 (U.S. Feb. 25, 2020); United States v. Smith, 820 F.3d 356, 360-62 (8th Cir. 2016); United States v. Rohrig, 98 F.3d 1506, 1521-23 (6th Cir. 1996); United States v. York, 895 F.2d 1026, 1029-30 (5th Cir. 1990). So, too, a handful of circuits — including our own — have held that police may sometimes seize individuals or property other than motor vehicles in the course of fulfilling community caretaking responsibilities. See, e.g., Rodriguez, 930 F.3d at 1138-41; Vargas v. City of Philadelphia, 783 F.3d 962, 971-72 (3d Cir. 2015); United States v. Gilmore, 776 F.3d 765, 769, 772 (10th Cir. 2015); Lockhart-Bembery, 498 F.3d at 75-76; Samuelson v. City of New Ulm, 455 F.3d 871, 877-78 (8th Cir. 2006); United States v. Rideau, 949 F.2d 718, 720 (5th Cir. 1991), vacated on other grounds, 969 F.2d 1572 (5th Cir. 1992) (en banc).

Today, we join ranks with those courts that have extended the community caretaking exception beyond the motor vehicle context. In taking this step, we recognize what we have termed

the "special role" that police officers play in our society. <u>Rodriguez-Morales</u>, 929 F.2d at 784. After all, a police officer — over and above his weighty responsibilities for enforcing the criminal law — must act as a master of all emergencies, who is "expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing, and provide an infinite variety of services to preserve and protect community safety." <u>Id.</u> at 784-85. At its core, the community caretaking doctrine is designed to give police elbow room to take appropriate action when unforeseen circumstances present some transient hazard that requires immediate attention. <u>See</u> <u>id.</u> at 787. Understanding the core purpose of the doctrine leads inexorably to the conclusion that it should not be limited to the motor vehicle context. Threats to individual and community safety are not confined to the highways. Given the doctrine's core purpose, its gradual expansion since <u>Cady</u>, and the practical realities of policing, we think it plain that the community caretaking doctrine may, under the right circumstances, have purchase outside the motor vehicle context. We so hold.

This holding does not end our odyssey. It remains for us to determine whether the community caretaking doctrine extends to the types of police activity that the defendants ask us to place under its umbrella. First, we must consider the involuntary seizure of an individual whom officers have an objectively

- 17 -

reasonable basis for believing is suicidal or otherwise poses an imminent risk of harm to himself or others. Second, we must consider the temporary seizure of firearms and associated paraphernalia that police officers have an objectively reasonable basis for thinking such an individual may use in the immediate future to harm himself or others. Third, we must consider the appropriateness of a warrantless entry into an individual's home when that entry is tailored to the seizure of firearms in furtherance of police officers' community caretaking responsibilities.

For several reasons, we conclude that these police activities are a natural fit for the community caretaking exception. To begin, the interests animating these activities are distinct from "the normal work of criminal investigation," placing them squarely within what we have called "the heartland of the community caretaking exception." Matalon, 806 F.3d at 634-35 (explaining that courts must "look at the function performed by a police officer" when examining whether activity falls within heartland (emphasis in original) (quoting Hunsberger v. Wood, 570 F.3d 546, 554 (4th Cir. 2009))). When police respond to individuals who present an imminent threat to themselves or others, they do so to "aid those in distress" and "preserve and protect community safety." Rodriguez-Morales, 929 F.2d at 784-85. These are paradigmatic examples of motivating forces for community

- 18 -

caretaking activity.  See Opperman, 428 U.S. at 374 (observing that "sole justification" for search in Cady was "the caretaking function of the local police to protect the community's safety").

We add, moreover, that any assessment of the reasonableness of caretaking functions requires the construction of a balance between the need for the caretaking activity and the affected individual's interest in freedom from government intrusions.  See United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993); Rodriguez-Morales, 929 F.2d at 786.  This balancing test must, of course, be performed anew in each individual case.  The community's strong interest in ensuring a swift response to individuals who are mentally ill and imminently dangerous will often weigh heavily in the balance.  After all, the consequences of a delayed response to such an individual "may be extremely serious, sometimes including death or bodily injury."  McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 547 (1st Cir. 1996).  Although an individual has robust interests in preserving his bodily autonomy, the sanctity of his home, and his right to keep firearms within the home for self-protection, these interests will sometimes have to yield to the public's powerful interest "in ensuring that 'dangerous' mentally ill persons [do] not harm themselves or others."  Id.

Last — but surely not least — encounters with individuals whom police reasonably believe to be experiencing acute mental

health crises frequently confront police with precisely the sort of damned-if-you-do, damned-if-you-don't conundrum that the community caretaking doctrine can help to alleviate. If police officers are left twisting in the wind when they take decisive action to assist such individuals and prevent the dreadful consequences that might otherwise ensue, they would be fair game for claims of overreach and unwarranted intrusion. Conversely, if the lack of constitutional protection leads police officers simply to turn a blind eye to such situations and tragedy strikes, the officers would be fair game for interminable second-guessing. Cf. Mora v. City of Gaithersburg, 519 F.3d 216, 228 (4th Cir. 2008) (observing that if police had "not taken the [plaintiff's] weapons, and had [the plaintiff] used those weapons to cause harm, the officers would have been subject to endless second-guessing and doubtless litigation").

The short of it is that the classes of police activities challenged in this case fall comfortably within the ambit of the community caretaking exception to the warrant requirement. But that exception is not a free pass, allowing police officers to do what they want when they want. Nor does it give police carte blanche to undertake any action bearing some relation, no matter how tenuous, to preserving individual or public safety. Put bluntly, activities carried out under the community caretaking banner must conform to certain limitations. And the need to patrol

vigilantly the boundaries of these limitations is especially pronounced in cases involving warrantless entries into the home. See Matalon, 806 F.3d at 633 ("It is common ground that a man's home is his castle and, as such, the home is shielded by the highest level of Fourth Amendment protection."). We turn next to these guardrails.

As a starting point, police officers must have "solid, noninvestigatory reasons" for engaging in community caretaking activities. Rodriguez-Morales, 929 F.2d at 787. They may not use the doctrine as "a mere subterfuge for investigation." Id. Leave to undertake caretaking activities must be based on "specific articulable facts," King, 990 F.2d at 1560, sufficient to establish that an officer's decision to act in a caretaking capacity was "justified on objective grounds," Rodriguez-Morales, 929 F.2d at 787. Then, too, those actions must draw their essence either from state law or from sound police procedure. See id. at 785.

Contrary to the plaintiff's importunings, "sound police procedure" need not involve the application of either established protocols or fixed criteria. We have defined sound police procedure broadly and in practical terms; it encompasses police officers' "reasonable choices" among available options. Id. at 787; see Coccia, 446 F.3d at 239 (explaining, in vehicle impoundment context, that "it is inappropriate for the existence of (and adherence to) standard procedures to be the sine qua non

- 21 -

of" reasonable community caretaking functions). There is, moreover, "no requirement that officers must select the least intrusive means of fulfilling community caretaking responsibilities." Lockhart-Bembery, 498 F.3d at 76. Even so, community caretaking tasks must be narrowly circumscribed, both in scope and in duration, to match what is reasonably required to perform community caretaking functions. See Opperman, 428 U.S. at 374-75; Smith, 820 F.3d at 362. The acid test in most cases will be whether decisions made and methods employed in pursuance of the community caretaking function are "within the realm of reason." Lockhart-Bembery, 498 F.3d at 75 (quoting Rodriguez-Morales, 929 F.2d at 786).

Before endeavoring to apply these principles, we offer two final caveats. First, the terms "imminent" and "immediate," as used throughout this opinion, are not imbued with any definite temporal dimensions. Nor is our use of these terms meant to suggest that the degree of immediacy typically required under the exigent circumstances and emergency aid exceptions is always required in the community caretaking context. See Sutterfield, 751 F.3d at 561 (noting that "[t]he community caretaking doctrine has a more expansive temporal reach" than the emergency aid exception). Because the summary judgment record shows that a reasonable officer could have found that an immediate threat of harm was posed by the plaintiff and his access to firearms, see

<u>infra</u> Parts II(A)(3)-(4), we need not decide whether the community caretaking exception may ever countenance a police intrusion into the home or a seizure (whether of a person or of property) in response to some less immediate danger.

Second, the parties debate, albeit in a desultory manner, whether the officers had probable cause to seize the plaintiff. We have used such a metric in considering seizures of the person pursuant to civil protection statutes, <u>see</u>, <u>e.g.</u>, <u>Alfano</u>, 847 F.3d at 77, but generally have scrutinized community caretaking activities for reasonableness, <u>see</u>, <u>e.g.</u>, <u>Lockhart-Bembery</u>, 498 F.3d at 75. Here, the police intrusions at issue — specifically, the seizures of an individual for transport to the hospital for a psychiatric evaluation and of firearms within a dwelling — are of a greater magnitude than classic community caretaking functions like vehicle impoundment. In such circumstances, it may be that some standard more exacting than reasonableness must be satisfied to justify police officers' conduct. Once again, though, we need not definitively answer this question: the record makes manifest that an objectively reasonable officer would have acted <u>both</u> within the realm of reason and with probable cause by responding as the officers did in this instance.[6]

---

[6] Withal, we think it bears mention that similar police activities carried out under the auspices of some analogous exceptions to the warrant requirement are traditionally not evaluated under a probable cause framework. <u>See</u>, <u>e.g.</u>, <u>Hill</u>, 884

For ease in exposition, we nonetheless use variations of the term "reasonable" throughout this opinion to describe the defendant officers' conduct.

Having laid the foundation, we move from the general to the specific.  The key questions, of course, relate to whether the defendants acted within the margins of the Fourth Amendment both when they seized the plaintiff and when they seized his firearms.

**3. The Seizure of the Plaintiff.**  As said, the plaintiff alleges that he was unlawfully seized by the defendant officers when they sent him to the hospital for a psychiatric evaluation. The officers lean on the community caretaking exception as their justification for this seizure.

Our review of the record makes manifest that no rational factfinder could deem unreasonable the officers' conclusion that the plaintiff presented an imminent risk of harming himself or others.  Viewed objectively, the facts available to the officers at the time of the seizure place this conclusion well within the realm of reason.  The officers knew that the plaintiff had fetched a firearm during an argument and implored his wife to "shoot [him] now and get it over with."  They also knew that his behavior had so dismayed his wife that she spent the night at a hotel and

---

F.3d at 23 (holding that police need only show objectively reasonable basis to believe "person inside the home is [in] need of immediate aid" to justify warrantless entry under emergency aid exception).

requested a wellness check on her husband the next morning because she feared that he might have committed suicide. No rational finder of fact could determine that an officer confronted with this scenario would be acting unreasonably by refusing to shut his eyes to the plaintiff's obvious risk of self-harm.

We conclude, as well, that the officers acted in conformity with sound police procedure by seizing the plaintiff and sending him to the hospital for a psychiatric evaluation. CPD General Order 320.70, which was in effect in August of 2015, authorized officers to send an individual who is "imminently dangerous" to himself or others to a hospital by means of emergency transportation for an involuntary psychiatric evaluation. The plaintiff counters that General Order 320.80 (which requires police to terminate civil "keeping the peace" activities if met with resistance) is a trump card, rendering the officers' conduct impermissible in light of the plaintiff's alleged resistance to visiting the hospital. We disagree. General Order 320.70 plainly governs factual scenarios where, as here, CPD officers encounter individuals whom they reasonably perceive are imminently dangerous and in need of an emergency psychiatric evaluation.

Even if the officers' actions were not tethered to an established procedure, their decision to remit the plaintiff to the hospital would still have fallen within the universe of

reasonable choices available to them at the time.[7]  Faced with the

unenviable choice between sending the plaintiff to the hospital

and leaving him (agitated, ostensibly suicidal, and with two

handguns at his fingertips), the officers reasonably chose to be

proactive and to take preventive action.  Because community

caretaking functions need only be warranted under either state law

or sound police procedure (as we have broadly defined that term),

see Rodriguez-Morales, 929 F.2d at 785, 787, and the seizure here

was fully justified by the latter, the plaintiff's remonstrance

that no positive state law or existing CPD order had explicitly

extended the community caretaking exception to this factual

scenario is without force.  To cinch the matter, the methods

employed by the officers to effectuate the seizure were within the

realm of reason.  The undisputed facts reveal that the officers

facilitated the plaintiff's transport to the hospital by ambulance

---

[7] Relying chiefly on the opinions of a retained expert, the plaintiff faults the officers for not consulting a list of warning signs that CPD officers are trained to recognize when they encounter potentially suicidal individuals.  He likewise faults the officers for failing to pose a series of questions that CPD officers are trained to ask such individuals.  In this case, though, the plaintiff arguably exhibited a significant number of warning signs and, beyond denying that he was suicidal, steadfastly refused to discuss his mental health.  And in any event, the outcome of our inquiry into whether the officers followed sound police procedure does not hinge on their application of fixed criteria.  See Coccia, 446 F.3d at 239; Rodriguez-Morales, 929 F.2d at 787.

in a calm, professional manner and without any physical coercion or restraints.

In an initial effort to blunt the force of this reasoning, the plaintiff first suggests that his production of the unloaded firearm and his exhortation to "shoot [him] now" were mere "dramatic gesture[s]" that did not bespeak any suicidal ideation. Even if the plaintiff intended only a hyperbolic flourish, we cannot say that it was outside the realm of reason for the officers to discern a serious risk of imminent self-harm, given the surrounding factual context: a man had recklessly thrown a firearm, made a desperate exclamation suggesting (at best) a fraught frame of mind or (at worst) a propensity for self-harm, and so unnerved his wife that she hid the magazine for the gun from him, stayed overnight at a hotel, and worried whether her husband might have committed suicide the next morning. Standard police equipment does not include crystal balls. Here, we think it apparent that the officers were amply warranted on objective grounds in concluding that the flashing red lights signaled imminent danger. See id. at 787.

Nor do we accept the plaintiff's argument that the passage of approximately twelve hours between the plaintiff's outburst and his encounter with the officers necessarily diminished the imminence of the potential threat. See Ahern v. O'Donnell, 109 F.3d 809, 818 (1st Cir. 1997) (per curiam)

(rejecting argument that officers "could not reasonably have viewed [plaintiff] as dangerous because he did not engage in dangerous behavior between" troubling telephone call and seizure approximately thirty-seven hours later).  It is, of course, true that "emergencies do not last forever." Sutterfield, 751 F.3d at 562.  On these facts, though, it seems to us — as it could have appeared to objectively reasonable officers — that the mere passage of a short period of time, without more, was not enough to allay the valid fear that the plaintiff might do harm to himself or others, particularly when the plaintiff's wife continued to express urgent concerns about the plaintiff's well-being the morning after his disturbing interaction with her.  See id.

We find similarly unconvincing the plaintiff's argument that no reasonable officer could have determined that the plaintiff posed an imminent threat to himself or to others because he appeared calm and denied suicidal intentions.  We do not gainsay that either an individual's demeanor or his self-assessment of his mental health (or both, in combination) might under some circumstances render unreasonable any conclusion that the individual posed a danger to himself or others.  But nothing in the record before us suggests that the plaintiff's relatively calm demeanor and conclusory assurances that he was not suicidal significantly reduced the likelihood that he might engage in self-harm.  See id. at 563; Ahern, 109 F.3d at 818.  After all, suicidal

individuals are not apt to be the best judges of their own mental health. Common sense teaches that such individuals may deliberately conceal or downplay their self-destructive impulses, particularly when speaking with the police. See Rudolph v. Babinec, 939 F.3d 742, 747 (6th Cir. 2019) (per curiam). So, too, the plaintiff's reliance on the fact that he was neither admitted to the hospital nor deemed suicidal by medical personnel is mislaid.[8] The lawfulness of the defendants' actions must be measured by the facts in the officers' possession at the time of the seizure, not by whether the conclusions that they drew from those facts were later substantiated. See United States v.

---

[8] We likewise discount the plaintiff's reliance on the opinion of his retained expert, see supra note 7, who concluded that the plaintiff's words and actions could not "possibly be construed as indicating that he was at imminent risk of suicide." In formulating this opinion, the expert cited only the plaintiff's assessment of his own behavior, offered during an interview held some three years after the events that gave rise to this litigation. The plaintiff's subjective, post hoc rationalizations are irrelevant to whether the officers made objectively reasonable determinations based on the facts available to them. See Ahern, 109 F.3d at 817. Moreover, it is unclear whether the expert, when rendering this opinion, viewed the evidence from the perspective of an objectively reasonable officer rather than, as his report seemed to indicate, from the vantage point of a trained psychologist with "more than 47 years [of experience] as a Suicidologist." That an expert psychologist might have reached a different conclusion about the plaintiff's condition than a police officer without such training does not render the officers' determination objectively unreasonable. Cf. Sutterfield, 751 F.3d at 562 (noting that "[o]nly a medical professional could make" ultimate judgments about "risk that [plaintiff] might harm herself"). Consequently, the expert's opinion does not create a genuine issue of material fact.

Huffman, 461 F.3d 777, 785 (6th Cir. 2006); Ahern, 109 F.3d at 817-18; cf. United States v. Coombs, 857 F.3d 439, 446 (1st Cir. 2017) (admonishing that "[h]indsight is always 20/20"). In this case, the facts available to the officers at the time of the alleged seizure warranted their conclusion that the plaintiff posed a serious and imminent risk of harming himself or others.

In an attempt to find a pearl in an apparently empty oyster, the plaintiff contends that if the officers wished to send him to the hospital to undergo a psychiatric evaluation, the RIMHL required them first to secure a judicial order committing him to the hospital, obtain a physician's application for emergency certification, or file a written application for emergency certification themselves. This contention is futile.

To begin, police officers cannot file petitions for civil court certification. See R.I. Gen. Laws § 40.1-5-8(a) (2006) (amended 2018). Here, moreover, the defendant officers could not, given the factual circumstances at hand, have filed an application for the plaintiff's emergency certification. In August of 2015, the RIMHL — since amended — allowed police officers to apply for the emergency certification of an individual "whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability" only if "no physician [was] available" to conduct an initial examination. Id. § 40.1-5-7(a)(1) (2006) (amended 2017). An objectively

reasonable officer would have understood (as the defendant officers apparently did) that a physician competent to perform a preliminary assessment of the plaintiff's mental health would be readily available at the hospital. Consequently, the RIMHL did not permit the defendant officers to file an application for emergency certification themselves.

At the time of the plaintiff's seizure, the RIMHL neither explicitly authorized nor expressly forbade police officers from transporting individuals whom they reasonably perceived as imminently suicidal to the hospital and causing them to undergo a preliminary psychiatric evaluation by a physician who could make an independent judgment about whether to file an application for emergency certification. By contrast, General Order 320.70 gave CPD officers the authority to transport such individuals to the hospital and ensure that they were evaluated. Importantly, the RIMHL did not purport to preclude such police activity in pursuance of internal policies and procedures. The plaintiff offers no reason as to why we should not read the RIMHL in harmony with General Order 320.70. Cf. Rathbun v. Autozone, Inc., 361 F.3d 62, 68 (1st Cir. 2004) (explaining that under "in pari materia" canon of construction, legal provisions that "relate to the same subject matter should be considered together so that they will harmonize with each other and be consistent with their general objective scope" (quoting State v. Ahmadjian, 438 A.2d 1070, 1081 (R.I.

1981))).  Such a harmonious reading conduces to the conclusion that the defendant officers' seizure of the plaintiff did not violate state law.

To say more about the seizure of the plaintiff's person would be supererogatory.  We conclude that no rational factfinder could determine that the defendant officers strayed beyond the realm of reason by deeming the plaintiff at risk of imminently harming himself or others.  Consequently, the officers' seizure of the plaintiff was a reasonable exercise of their community caretaking responsibilities.  Thus, that seizure did not offend the Fourth Amendment.

**4. The Seizure of the Firearms.**  The next hill we must climb relates to the defendant officers' warrantless entry into the plaintiff's home and their seizure of his handguns.  Seizures of personal property generally require a warrant or some recognized exception to the warrant requirement.  See United States v. Sanchez, 612 F.3d 1, 4 (1st Cir. 2010).  The same benchmark obtains, with particular force, for entries into the home.  See Payton v. New York, 445 U.S. 573, 589-90 (1980); MacDonald, 745 F.3d at 12.  Once again, the defendant officers seek to cloak their conduct in the raiment of the community caretaking function.

Notwithstanding our two-pronged assumption that the plaintiff remained seized within the meaning of the Fourth Amendment during his time at the hospital and that his psychiatric

evaluation was involuntary, our assessment of the seizure of his firearms does not turn on what actually happened at the hospital. Instead, this assessment centers on how an objectively reasonable officer remaining at the residence after the plaintiff's departure could have appraised the danger posed by the handguns in the plaintiff's home. We conclude that the officers could reasonably have believed, based on the facts known to them at the time, that leaving the guns in the plaintiff's home, accessible to him, posed a serious threat of immediate harm. To begin, the plaintiff freely admitted to throwing one of the firearms onto a table and making a statement that a reasonable officer could have construed as a harbinger of self-harm. What is more, this episode so concerned the plaintiff's wife that she felt compelled to hide the magazine containing the bullets for that gun and then to leave the dwelling to stay overnight at a hotel. To cap the matter, the officers knew that the plaintiff might soon return to a contentious domestic environment, that he was "sick of the arguments" with his wife, and that he was upset that she had involved the police. These facts could have led an objectively reasonable officer to grow concerned that, despite Kim's assurances that she did not fear for her own safety, she too might be at near-term risk.

The plaintiff counters that he already had been removed from the scene at the time of the seizure. That is true as far as it goes, but it does not take the plaintiff very far. From the

perspective of an objectively reasonable officer, the plaintiff's departure had not necessarily dispelled the threat of harm.[9] There is no evidence that the officers had any inkling when the plaintiff would return or what his mental state might be upon his return. And since the officers did not accompany the plaintiff to the hospital, they had no way of knowing precisely what information would be imparted to healthcare providers about the plaintiff's circumstances. Similarly, they had no way of knowing whether emergency services personnel would monitor the plaintiff to ensure that he was evaluated, let alone whether an emergency certification would ensue. And even though the plaintiff had assented to go to the hospital for an evaluation, his initial reticence and refusal to answer certain questions about his mental health could have given an objectively reasonable officer pause about whether he would in fact submit to an evaluation. Such doubts would have been typical for CPD officers faced with this sort of scenario: Captain Henry (the officer who approved the seizure of the

---

[9] The plaintiff calls our attention to the defendants' apparent concession (during oral argument on the summary judgment motions in the district court) that neither the exigent circumstances exception nor the emergency aid exception could have justified the seizure of the plaintiff's firearms after he had been removed from the scene. Because the defendants have not invoked either exception as a justification for the seizure, it would serve no useful purpose for us to speculate about the relevance of any such concession. In all events, the defendants have consistently asserted, both here and in the court below, that the threat of peril did not evaporate once the plaintiff was removed from the scene.

plaintiff's firearms) testified that although CPD officers can forcibly transport individuals in need of emergency psychiatric evaluations to the hospital, officers cannot "force [such individuals] to participate in anything" and would not try to do so.

On this record, an objectively reasonable officer remaining at the residence after the plaintiff's departure could have perceived a real possibility that the plaintiff might refuse an evaluation and shortly return home in the same troubled mental state.[10]  Such uncertainty, we think, could have led a reasonable officer to continue to regard the danger of leaving firearms in the plaintiff's home as immediate and, accordingly, to err on the side of caution.  See Rodriguez, 930 F.3d at 1140 (observing that "reasonable officer would have been deeply concerned by the prospect" that individual who threatened shooting "might have had

_____

[10] At the time of the plaintiff's seizure, an application for emergency certification could be filed for an individual who refused to consent to an examination if the applicant's observations of the individual demonstrated that "emergency certification [was] necessary."  R.I. Gen. Laws § 40.1-5-7(a)(1) (2006) (amended 2017).  Nothing in the RIMHL indicated, however, that an individual who refused to consent to an evaluation could be physically restrained between the moment of their refusal and the execution of an application for emergency certification (which could take place up to five days after the applicant last observed the individual, see id. § 40.1-5-7(b)).  Accordingly, if the plaintiff had refused to submit to an evaluation and a physician had nonetheless determined that an application for certification should be filed, it remained a distinct possibility that the plaintiff could simply have left the hospital and returned home while such an application was being prepared.

- 35 -

access to a firearm in the near future," even though individual had been taken to hospital); Mora, 519 F.3d at 228 (rejecting argument that "emergency vanished" after appellant left for hospital, partially due to lack of certainty about when appellant would return and what his state of mind would be at that time).

One rejoinder to this conclusion (albeit a rejoinder not advanced by the plaintiff) might be that the defendant officers should have accompanied the plaintiff to the hospital to see how events unfolded before taking action with respect to his firearms. Although that is a reasonable course of action that could have been pursued, we do not require police officers to choose the least intrusive means of fulfilling their community caretaking responsibilities. See Lockhart-Bembery, 498 F.3d at 76. Nor is it at all clear that accompanying the plaintiff to the hospital and monitoring his interactions with medical staff would have been less intrusive than a circumscribed entry into the plaintiff's home. Because the officers' decision to seize the plaintiff's handguns for temporary safekeeping was within the realm of reason, it does not matter that "alternative reasonable options were also available." Id.; see Rodriguez-Morales, 929 F.2d at 786 (observing that "critical question" in vehicle impoundment case was not whether officers "could have effected an impoundment more solicitously, but whether the decision to impound and the method

chosen for implementing that decision were, under all the circumstances, within the realm of reason").

We are likewise persuaded that the defendants' actions in entering the plaintiff's home and seizing his firearms were consistent with sound police procedure. The police play a vital role as guardians of the public weal. They must, therefore, be granted some measure of discretion when taking plausible steps to protect public safety, particularly when human life may be at stake and the margin for error is slight. See Rodriguez-Morales, 929 F.2d at 786-87 (explaining that the "search for equipoise" in community caretaking cases "almost always involves the exercise of discretion" (quoting Lopez Lopez v. Aran, 844 F.2d 898, 905 (1st Cir. 1988))). As the Seventh Circuit cogently reasoned in an analogous case, "[o]ne need only imagine the public outcry . . . had the police left the gun[s]" in place and the plaintiff "returned home and then used the gun[s]" to inflict harm. Sutterfield, 751 F.3d at 570. Here, the officers' decision to confiscate the firearms was a reasonable choice from among the available alternatives. See Rodriguez, 930 F.3d at 1139-40 (holding that police had "substantial public safety interest" in preventing access to guns when mentally ill individual had threatened violence); United States v. Harris, 747 F.3d 1013, 1018-19 (8th Cir. 2014) (concluding that officers were allowed to seize firearm when failure to do so could have resulted in "[a]ny number

- 37 -

of dangerous, or even deadly, outcomes"); Mora, 519 F.3d at 227 (deeming "public safety rationale" a "sound basis" for seizing firearms of individual who had threatened suicide and shooting).

To close the circle, the record establishes that the methods employed by the police to effectuate the seizure of the firearms were reasonable. The officers did not ransack the plaintiff's home, nor did they engage in a frenzied top-to-bottom search for potentially dangerous objects. Instead — relying on Kim's directions — they tailored their movements to locate only the two handguns bearing a close factual nexus to the foreseeable harm (one of which the plaintiff had admitted throwing the previous day and the other of which had been specifically called to the officers' attention).

We add a coda. In upholding the defendants' actions under the community caretaking doctrine, we in no way trivialize the constitutional significance of warrantless entries into a person's residence, disruption of the right of law-abiding citizens to keep firearms in their homes, or involuntary seizures of handguns. By the same token, though, we also remain mindful that police officers have a difficult job — a job that frequently must be carried out amidst the push and pull of competing centrifugal and centripetal forces. Police officers must sometimes make on-the-spot judgments in harrowing and swiftly evolving circumstances. Such considerations argue persuasively in

favor of affording the police some reasonable leeway in the performance of their community caretaking responsibilities.

In the circumstances of this case, we think that no rational factfinder could deem unreasonable either the officers' belief that the plaintiff posed an imminent risk of harm to himself or others or their belief that reasonable prudence dictated seizing the handguns and placing them beyond the plaintiff's reach. Consequently, the defendants' actions fell under the protective carapace of the community caretaking exception and did not abridge the Fourth Amendment.

## B. **The Remaining Claims**.

Having tackled the plaintiff's most substantial assignments of error, we proceed to his other claims. We first examine the plaintiff's claims that the defendant officers, in their individual capacities, violated the Second Amendment by seizing his firearms. Next, we assess the plaintiff's municipal liability claims. At that juncture, the lens of our inquiry narrows to evaluate the plaintiff's claims that the defendants abridged the Rhode Island Constitution. We conclude with an appraisal of the two state statutory claims advanced by the plaintiff.

1. **The Second Amendment Claims**. The plaintiff insists that the defendant officers violated the Second Amendment by seizing the two handguns from his home. He concedes, however,

that the officers never attempted to restrict his ability to purchase or possess other firearms. The district court rejected this claim, ruling that "the Second Amendment is not implicated when the police reasonably seize a gun under their well-established duties as community caretakers" and that "the Second Amendment does not protect an individual's right to possess a particular gun." Caniglia, 396 F. Supp. 3d at 237.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has determined that the Second Amendment protects an individual's right to keep and bear arms even outside the context of service in a militia. See District of Columbia v. Heller, 554 U.S. 570, 592 (2008); see also McDonald v. City of Chicago, 561 U.S. 742, 791 (2010) (applying Second Amendment to states through Fourteenth Amendment). Although the Heller Court did not venture to delineate the complete dimensions of the Second Amendment right, it made clear that the Second Amendment does not guarantee an unlimited right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626.

Our precedent teaches that the core of the Second Amendment right is confined to self-defense in the home by law-abiding citizens. See Worman v. Healey, 922 F.3d 26, 36 (1st Cir.

2019), petition for cert. filed, No. 19-404 (U.S. Sept. 25, 2019); Gould v. Morgan, 907 F.3d 659, 671 (1st Cir. 2018), petition for cert. filed, No. 18-1272 (U.S. Apr. 4, 2019). We have not yet had occasion to address whether the seizure of specific firearms from the home in pursuance of a legitimate police function infringes on this core right when, as in this case, a gunowner has not been barred from keeping or acquiring other firearms.

There are few guideposts bearing on the resolution of this issue. The appellate courts that have grappled with the issue have either skirted it, see Sutterfield, 751 F.3d at 571-72, or have held that the deprivation of specific firearms does not abridge the Second Amendment, see Rodgers v. Knight, 781 F.3d 932, 941-42 (8th Cir. 2015). When all is said and done, we need not conduct an archeological dig into this uncertain terrain. Regardless of whether the seizure of particular firearms can ever infringe the Second Amendment right — a matter on which we take no view — it was by no means clearly established in August of 2015 that police officers seizing particular firearms in pursuance of their community caretaking functions would, by doing so, trespass on the Second Amendment. Here, the plaintiff has wholly failed to identify either binding precedent or a chorus of persuasive authority "sufficient to send a clear signal" to reasonable officers, Alfano, 847 F.3d at 75, that seizures of individual

firearms pursuant to the community caretaking exception fell outside constitutional bounds.

The doctrine of qualified immunity is by now familiar. We previously set forth the parameters of that doctrine. See supra note 3. In general terms, the doctrine is designed to shield government officials from suit when no "red flags [were] flying" at the time of the challenged action — red flags sufficient to alert reasonable officials that their conduct was unlawful. MacDonald, 745 F.3d at 15. Because this is such a case, the defendant officers in their individual capacities are entitled to qualified immunity with respect to the plaintiff's Second Amendment claims. We therefore hold that the district court did not err in granting them summary judgment on those claims.

2. **The Municipal Liability Claims.** This brings us to the plaintiff's section 1983 claims against the City and the defendants in their official capacities. See Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir. 1993) ("An official capacity suit is, in reality, a suit against the governmental entity, not against the governmental actor."). The plaintiff submits that the City maintains "an ongoing practice of seizing people and requiring them to have psychological evaluations and seizing their firearms without court orders or exigent circumstances." See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978) (holding that local governments may be sued under

section 1983 pursuant to practices that are "so permanent and well settled as to constitute a 'custom or usage' with the force of law" (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970))). In this instance, the plaintiff asserts that the challenged practice resulted in a violation of his Fourth Amendment rights.

The Monell Court made clear that municipalities cannot "be held liable [under section 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." Id. at 691 (emphasis supplied); see Lund v. Henderson, 807 F.3d 6, 10 n.2 (1st Cir. 2015); Kennedy v. Town of Billerica, 617 F.3d 520, 531-32 (1st Cir. 2010). We already have held that the officers' conduct fell within the encincture of the community caretaking function and, thus, did not offend the Fourth Amendment. Given this determination, it necessarily follows that the plaintiff cannot prevail against the City on a theory of municipal liability grounded on a Fourth Amendment species of constitutional tort.

This does not end the matter. It is not entirely clear whether the plaintiff's claims against the City, as configured on appeal, encompass a Second Amendment component. Relying on the plaintiff's allegations in the complaint, the district court framed the plaintiff's Second Amendment claims as alleging, in relevant parts, that the City "deprived him of his lawfully

obtained and possessed weapons for no reason" through a "set of customs, practices, and policies." Caniglia, 396 F. Supp. 3d at 236.

On appeal, though, the plaintiff does not appear to assert that the City is liable for an underlying Second Amendment violation. While he summarily adverts to the City's "unwritten practice of seizing firearms for safekeeping" in portions of his brief concerned with the alleged Fourth Amendment violations, he never connects these cursory allusions to municipal liability with his claim of an underlying Second Amendment violation. Indeed, the portion of his reply brief dealing with the City's liability under section 1983 only mentions the City's purported violations of the Fourth Amendment and the Rhode Island Constitution. More problematic still, even though the record contains evidence that might perhaps have been effectively marshaled to illustrate a custom of seizing firearms for safekeeping under conditions like those at hand (including a General Order and testimony from the police chief and various officers), the plaintiff's efforts to assemble and analyze that evidence are unacceptably meager. The net result is that, even if we assume that the plaintiff intended to argue on appeal that the City caused an infringement of his Second Amendment right by way of a custom or policy, that claim has been fatally underdeveloped.

We need not tarry.  In this circuit, it is settled beyond peradventure that a reviewing court is not obliged to do a lawyer's work for him by putting meat on the bones of a skeletal argument. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  Id. Accordingly, we deem abandoned any claim that the plaintiff suffered a Second Amendment violation because of a policy or practice attributable to the City.

**3. The State Constitutional Claims.**  We come now to the plaintiff's claims that the seizure of both his person and his handguns transgressed article 1, section 6 of the Rhode Island Constitution and his imbricated claim that the handgun seizure also violated article 1, section 22.  We address these claims sequentially.

**(a).**  Article 1, section 6 of the Rhode Island Constitution guarantees "[t]he right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures."  The plaintiff contends that the officers' conduct violated this provision, which he asserts "provides stronger protections against searches and seizures than the Fourth Amendment."  For several reasons, this argument lacks force.

With certain limited exceptions, not relevant here, the Rhode Island Supreme Court construes article 1, section 6 as

- 45 -

coextensive with the Fourth Amendment.  See, e.g., State v. Morris, 92 A.3d 920, 930 (R.I. 2014); Duquette v. Godbout, 471 A.2d 1359, 1361 (R.I. 1984).  This lockstep approach holds true both in cases involving entries into dwellings under emergency circumstances, see, e.g., Duquette, 471 A.2d at 1361-62, and in cases concerning the seizure of individuals, see, e.g., State v. Foster, 842 A.2d 1047, 1049-50, 1050 n.3 (R.I. 2004) (per curiam).  With respect to the types of police activity at issue here, we have no reason to suspect that the Rhode Island Supreme Court would afford more robust protection under article 1, section 6 than is available under the Fourth Amendment.  See State v. Andujar, 899 A.2d 1209, 1223-24, 1224 n.12 (R.I. 2006) (cautioning that decision to depart from minimum Fourth Amendment protection "should be made guardedly" (quoting State v. Werner, 615 A.2d 1010, 1014 (R.I. 1992))).

Moreover, although the state supreme court has not explicitly extended the community caretaking doctrine either to warrantless seizures of individuals and property or to warrantless entries into dwellings, it has articulated an expansive view of the doctrine.  For example, the court has described the doctrine as one concerning "the many varied daily tasks" police are called upon to perform, including "acting as a domestic-relations counselor," serving as a makeshift midwife, and informing a "citizen of the loss of a loved one."  State v. Cook, 440 A.2d

137, 139 (R.I. 1982); see State v. Roussell, 770 A.2d 858, 860-61 (R.I. 2001) (per curiam).

To complete the picture, we think it noteworthy that the Rhode Island Supreme Court has adopted an "emergency doctrine" that bears some resemblance to the community caretaking function. See, e.g., Duquette, 471 A.2d at 1362 (deeming forcible entry into apartment justified under Fourth Amendment and article 1, section 6 because police had reason to believe minor was in peril inside). An expansion of the exigent circumstances exception, the emergency doctrine permits warrantless police activity on private premises (including entries into dwellings) when officers "have a reasonable belief that [their] assistance is required to avert a crisis" and the motivation underlying the activity is "to preserve life and property rather than to search for evidence to be used in a criminal investigation." Id.; see State v. Goulet, 21 A.3d 302, 313-14 (R.I. 2011); State v. Portes, 840 A.2d 1131, 1136-37 (R.I. 2004).

Given the Rhode Island Supreme Court's expansive conception of the community caretaking function, its adoption of the "emergency doctrine," and its demonstrated propensity to construe article 1, section 6 as coterminous with the Fourth Amendment, we discern no basis for believing that the state supreme court would find that the officers' conduct violated the state constitution. Since the plaintiff has failed to offer any

convincing rationale as to why the defendants' seizures of his person and his firearms would violate article 1, section 6 when those seizures do not violate the Fourth Amendment, summary judgment for the defendants was appropriate on this aspect of the plaintiff's state constitutional claims.

**(b)**. The plaintiff also contends that the seizure of his firearms violated article 1, section 22 of the Rhode Island Constitution. This provision memorializes the principle that "[t]he right of the people to keep and bear arms shall not be infringed." In the plaintiff's view, article 1, section 22 guarantees him an absolute right to keep arms in his home; and he asserts that the defendants infringed this right by taking his firearms without a warrant, court order, or exigent circumstances. The district court rejected this claim, see Caniglia, 396 F. Supp. 3d at 236-37, and so do we.

The plaintiff's argument that article 1, section 22 guarantees an absolute right to keep guns in the home appears to be wishful thinking. The argument hangs by a single thread: a line in a footnote in Mosby v. Devine, 851 A.2d 1031, 1043 n.7 (R.I. 2004). There, the Rhode Island Supreme Court reviewed the RIFA's licensing framework for the carriage of pistols and revolvers, see R.I. Gen. Laws § 11-47-18; Mosby, 851 A.2d at 1047. In a footnote refuting the dissent's "assertions about the law of self-defense in Rhode Island," the court stated, without citation

to any authority, that "one has an absolute right to keep firearms in one's home or place of business." Mosby, 851 A.2d at 1043 n.7. This singular statement cannot support the weight of the plaintiff's argument that his right to keep firearms in the home is unfettered.

To begin, the statement was not essential to the court's review of the licensing scheme before it, which principally implicated the right to carry certain types of guns outside homes and businesses (not the right to keep guns within the home). See id. at 1043 n.6 (deeming retention of guns in home "a situation far removed from the issues facing us today"). "[O]bservations relevant, but not essential, to the determination of the legal questions" before a court are paradigmatic examples of non-binding dicta. Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 459 (1st Cir. 1992).

Although courts often give weight to dictum that appears "considered as opposed to casual," id., we cannot say that the sentence on which the plaintiff relies qualifies as considered dictum. For one thing, when viewed in the fullness of the surrounding text, the sentence sends mixed signals about the scope of the right to keep arms in the home under article 1, section 22. After all, in the text that immediately precedes the footnote in which the sentence at issue appears, the Mosby court left no doubt that it would not attempt to either "define the extent" of the

rights to keep and bear arms or "establish the limits" of article 1, section 22. 851 A.2d at 1043. And for another thing, the sentence is little more than a waif in the wilderness, unaccompanied by citation of authority or any further elucidation.

We need not dwell on this claim. Beyond his plaint that article 1, section 22 guarantees an "absolute" right to keep guns in his home, the plaintiff has not adequately developed any other relevant argument. As a result, any such argument — including any contention that the Heller framework applies as a matter of state constitutional law under article 1, section 22 — has been waived. See Zannino, 895 F.2d at 17.

**4. The State Statutory Claims.** Our final chore is to consider the plaintiff's two state statutory claims, which seek damages for alleged violations of the RIMHL and the RIFA, respectively. The linchpin of both claims is yet another state statute: R.I. Gen. Laws § 9-1-2. This statute permits individuals to pursue claims for damages resulting from injuries caused by the commission of a crime (even if uncharged). See Kelly v. Marcantonio, 187 F.3d 192, 202 & n.8 (1st Cir. 1999).

**(a).** The plaintiff attempts to use section 9-1-2 as a respirator to breathe life into his RIMHL claim. To make the connection, he asserts that the defendants committed a criminal violation of the RIMHL by conspiring to have him admitted to the hospital. See R.I. Gen. Laws § 40.1-5-38 (criminalizing

conspiracy to "improperly cause to be admitted or certified to any facility" any person not covered by RIMHL).  He further asserts that by sending him to the hospital without first securing a physician's application for emergency certification or a judicial order committing him to the hospital, the defendants were, in effect, conspiring to have him improperly admitted.

This claim consists of more cry than wool.  As we already have concluded, see supra Part II(A)(3), the RIMHL — both when viewed in isolation and when read in conjunction with CPD General Order 320.70 — did not forbid the police from transporting an individual to the hospital for an outpatient psychiatric examination by a physician.  In addition, the record is devoid of any probative evidence that the defendants conspired to have the plaintiff admitted to the hospital.  Even when construed in the light most favorable to the plaintiff, see Avery, 661 F.3d at 691, the record discloses no more than that the defendants sought to have him transported to the hospital and evaluated by medical professionals.  There is simply no evidence, either direct or circumstantial, sufficient to support a finding that the defendants schemed to have him hospitalized.

**(b)**.  The plaintiff's RIFA claim fares no better.  The RIFA "regulate[s] the possession and use of an array of weapons." Mosby, 851 A.2d at 1045.  The plaintiff alleges that the RIFA makes certain violations of its terms punishable by imprisonment, see

R.I. Gen. Laws § 11-47-26, and further alleges that the defendants committed such a crime by seizing his firearms "without just cause." In support, the plaintiff relies on a wholly inapposite admonition in a section of the RIFA concerning the safe storage of firearms, which instructs that the section should not be construed "to provide authority to any state or local agency to infringe upon the privacy of any family, home or business except by lawful warrant." Id. § 11-47-60.1(a). Finally, the plaintiff alleges that he does not fall into any of the categories of persons prohibited from possessing firearms. See, e.g., id. § 11-47-6 (mental incompetents and drug addicts); id. § 11-47-7 (illegal aliens).

These allegations do not carry the day. As we already have held, see supra Part II(A)(4), the seizure of the plaintiff's firearms fell within the ambit of the community caretaking exception to the warrant requirement. The plaintiff has not identified any provision of the RIFA that criminalizes the temporary seizure of firearms pursuant to this exception. And because this case does not involve a categorical ban on the plaintiff's possession of firearms, his plaint that he cannot be totally foreclosed from possessing firearms lacks relevance.

In sum, no reasonable factfinder could conclude, on this record, that the defendants committed criminal violations under either the RIMHL or the RIFA. Thus, the court below did not err

in entering summary judgment for the defendants on the plaintiff's state statutory claims.

**III. CONCLUSION**

We need go no further. Police officers play an important role as community caretakers. As this case illustrates, they sometimes are confronted with peculiar circumstances — circumstances that present them with difficult choices. Here, the actions of the defendant officers, though not letter perfect, did not exceed the proper province of their community caretaking responsibilities. The able district court recognized as much and, for the reasons elucidated above, its judgment is

**Affirmed.**